**UNITED STATES of America**

v.

**John Bryant DANEALS et al.**

No. CR. 1972–285, et seq.

United States District Court,
W. D. New York.

Jan. 29, 1974.

John T. Elfvin, U. S. Atty., W. D. N. Y., Buffalo, N. Y., for the Government.

Joseph D. Bermingham, Jr. (Vincent E. Doyle, Jr., of counsel), Paul I. Birzon, Frederick B. Cohen, Stanley J. Collesano, Anthony J. Colucci, Robert B. Conklin, Thomas C. D'Agostino, Charles H. Dougherty, William H. Gardner, Michael J. Hutter, David Gerald Jay, Robert W. Keller, Leonard J. Klaif, J. Daniel Lenahan, Richard Lippes, William J. Love, Jr., Bruce P. Lytle, Joseph V. McCarthy, M. Brian Moroze, James F. Mulhern, Carmin R. Putrino, Richard J. Rosche, Jerome D. Schad, Albert S. Scialfo, Robert J. Solomon, Charles S. Spinner, Richard T. Sullivan, Buffalo, N. Y., Burt J. Valvo, Forestville, N. Y., Chester L. Mirsky, New York Civil Liberties Union, New York City, for defendants.

Before HENDERSON, Chief Judge, and CURTIN, District Judge.

CURTIN, District Judge.

Between November 14 and 17, 1972, 153 Selective Service cases were presented to the Grand Jury sitting in Buffalo, New York. The Grand Jury voted to indict in each case. During the last two weeks in November and early December, indictments were prepared, signed by the foreman of the Grand Jury and United States Attorney and formally handed up to the court, 98 on December 5, 1972 and 55 on December 12, 1972. Approximately 75 cases were assigned to each of the two judges sitting in Buffalo.

Arraignment of many defendants followed in late December and early January 1973. At arraignment, some defendants appeared with private counsel, some requested assigned counsel and some were represented by A.C.L.U. attorneys. Messrs. Gardner, Putrino and Collesano, who represent many defendants, have served as principal defense attorneys in bringing various motions during the course of this litigation. The court has received and considered affidavits and motions filed by other individual attorneys and at oral argument heard not only from the principal attorneys and the United States Attorney but also from any individual defense counsel who desired to be heard.

It became evident from studying defense counsel's discovery motions that there were many problems common to all the cases. To prevent the duplicative filing of papers and to conserve judicial time, both judges signed an order on January 29, 1973 setting forth the information the United States Attorney was to provide defense counsel and providing for the inspection of Selective Service documents. On March 20, 1973, upon application of the United States Attorney, the time for his office to submit answers and to make other information available for inspection was extended. After the United States Attorney provided the answers requested and defense counsel examined the Selective Service records, motions were made in many cases for examination of the Grand Jury testimony and for a bill of particulars. On July 5, 1973, the court entered a joint order directing the United States Attorney to "forthwith provide the counsel for each defendant the minutes of the grand jury testimony pertaining to said defendant." On July 25, 1973 after defense counsel had examined some of the Grand Jury minutes, the principal attorneys filed a motion requesting that a hearing be held on the manner in which the cases were presented to the Grand Jury and for dismissal of the indictments. Subsequently confusion arose as to the extent of the court's July

5 order and, when it became apparent that important information was not set forth in the Grand Jury transcripts, the court entered a further order on August 8, 1973 directing that all Grand Jury minutes be made available in the Clerk's office for inspection; that the government file (1) a table setting forth passage of time from referral to the United States Attorney until presentation for indictment in each case, and (2) an affidavit explaining the manner in which the cases were presented to the Grand Jury. In response to that order, the United States Attorney filed an affidavit explaining how the cases were presented to the Grand Jury and a table showing the time lapse from date of referral to date of indictment. He also filed affidavits of Roger P. Williams, the Assistant United States Attorney charged with the presentation of these cases to the Grand Jury, United States Army Colonel Williard I. Silverberg, who was employed as Regional Counsel for the Selective Service System, and Dorothy A. Wheeler and Dorothy A. Gourdin, employees of the Selective Service System, who appeared as witnesses before the Grand Jury.

After the United States Attorney filed his response in late August 1973, defense counsel renewed their motions for dismissal of the indictments, filed further affidavits and both sides filed briefs with the court. On October 4, 1973 the court, sitting jointly, heard oral argument from counsel. Defense counsel asserted that the indictments should be dismissed for a number of reasons: (1) the delay in presentation of the cases to the Grand Jury; (2) the unauthorized appearance of Colonel Silverberg before the Grand Jury; (3) improper reliance by the government on hearsay testimony before the Grand Jury; (4) the failure to record all the testimony before the Grand Jury; (5) the presentation of multiple count indictments was misleading; (6) the failure to present Selective Service files to the Grand Jury for inspection; (7) erroneous information about the files was given to the Grand Jury; (8) the Grand Jury did not examine the indictments in their final form, and (9) the precipitous manner in which the cases were presented to the Grand Jury, which prevented the Jury from a careful consideration of the facts in each case.

During oral argument, defense counsel conceded that the affidavits filed by the United States Attorney gave an accurate account of the manner in which the cases were presented to the Grand Jury and the request for a hearing was withdrawn. The court is satisfied that a hearing is not required. Because of the nature of the motions made by defense counsel and the history of this litigation, the court will deem this motion made on behalf of all the defendants in the 153 cases presented from November 14 through November 17, 1972 which have not already been disposed of by prior court action.[1]

---

I. JUDGE CURTIN'S CASES DISMISSED UPON GOVERNMENT'S MOTION

United States v. Hyatt Frederick, CR. 72–305 (indictment dismissed as defective since induction date changed by order not previously noted).

United States v. Royal Aaron Johnson, CR. 72–306 (indictment dismissed, defendant classified 4–D on 12–20–72).

United States v. Robert John Wheaton, CR. 72–315 (man found 4–F).

United States v. James Richard Lenthe, CR. 72–330 (Board postponed induction; more than 120 days passed before Board acted again; defendant was entitled to new notice of classification because of passage of 120 days).

United States v. Steven Kent Miles, CR. 72–332 (Defendant reported for induction; was turned down).

United States v. Gary William Barnes, CR. 72–355 (Defendant enlisted in U. S. Army).

United States v. Roger Stanley Frey, CR. 72–363 (Defendant reclassified 1–H).

United States v. Lee Mark Harris, CR. 72–367 (Defendant reclassified before order to report for induction).

United States v. Michael John O'Buckley, CR. 72–369 (Defendant began alternate service).

In late August or early September 1972 when it became apparent to Mr. Elfvin, the United States Attorney, that there was a large number of Selective Service cases pending but unindicted in the Western District of New York, he sought assistance from the Department of Justice and the Selective Service System. In response to his request, two attorneys from the Department of Justice came to Buffalo and reviewed the files during the week of September 11, 1972. Colonel Williard I. Silverberg, Selective Service Regional Counsel, with another Selective Service attorney from Albany, came to Buffalo on September 13, 1972 to devote that day to a general review of the files. In November of 1972, 300 Selective Service cases were given to the Assistant United States Attorney for presentation to the Grand Jury if warranted. During the week of November 13, 1972, Colonel Silverberg returned to Buffalo and arranged for the assistance of three reservist attorneys to assist the United States Attorney's office in its preparation for presentation to the Grand Jury. After review, 153 cases were selected for presentation to the Grand Jury and prosecution was apparently declined on the others.

After a new Grand Jury was chosen and sworn on the morning of Tuesday, November 14, 1972, it met with the United States Attorney, the Assistant United States Attorney assigned to these cases, and Colonel Silverberg. Mr. Elfvin spoke briefly to the Grand Jury and after that the work was turned over to the Assistant in charge and Colonel

United States v. Harry Paul Block, CR. 72–370 (prior indictment pending).

United States v. Charles Kenneth Allen, Jr., CR. 72–387 (Jehovah's Witness, part-time ministry).

United States v. Thomas W. Myrtle, CR. 72–392 (Defendant was Jehovah's Witness minister for years).

United States v. John G. Palmer, CR. 72–394 (Jehovah's Witness).

United States v. William Joseph Weber, CR. 72–395 (Defendant went into Coast Guard).

United States v. Raymond Allan Keith, CR. 72–404 (Defendant disqualified when he reported for a physical).

United States v. Donnie A. Chillis, CR. 72–411 (Defendant appeared, found to be not acceptable).

United States v. James Stanley Karapanter, CR. 72–414 (Defendant appeared for induction, was refused).

United States v. Steven Ames Peterson, CR. 72–429 (Draft Board and Appeal Board gave no reason for denying C. O. classification).

United States v. David Albert Stickney, CR. 72–440 (Defendant reported for physical examination in June; was found unqualified).

United States v. Gary Richardson, CR. 73–216 (Defendant reported for physical and was turned down).

JUDGE HENDERSON'S CASES DISMISSED UPON GOVERNMENT'S MOTION

United States v. Reginald Anthony Sparks, CR. 72–310 (induction order conceded to be void and illegal).

United States v. Randal Lee Barber, CR. 72–312 (superseding indictment filed on April 12, 1973).

United States v. Sigmund Scumaj, CR. 72–317 (determination by the Regional Counsel for the Selective Service System that the original induction order of February 1970 was cancelled by the issuance of the second induction order of February 1971, thereby making the 3–A hardship claim a timely claim for deferment that should have been granted by the Local Board).

United States v. James Dewitt Preston, CR. 72–349 (When defendant voluntarily submitted for induction following arraignment, it was determined that he was not acceptable for induction due to a medical disqualification).

United States v. William Joseph Still, CR. 72–350 (Defendant found medically disqualified when he submitted to induction following arraignment).

United States v. James Thomas Vaccarella, CR. 72–354 (Defendant found medically unacceptable).

United States v. Glenn Alan Anderson, CR. 72–406 (Based on medical reports of private physicians, registrant was called for a physical examination and found permanently medically disqualified).

United States v. Marco Eleazar Swados, CR. 72–423 (improper after-the-fact determination of the Local Board not to extend the appeal period).

United States v. Dale Herman Leroy, CR. 72–407 (Defendant found medically unacceptable when he reported for induction).

United States v. Francis Charles McClure, CR. 72–311 (Defendant voluntarily reported for induction and was found not morally acceptable for induction due to his prior criminal record).

Silverberg. Prior to the witnesses' testimony, Colonel Silverberg appeared unsworn before the Grand Jury and made a statement concerning the general nature of Selective Service law. He extended to the Assistant United States Attorney general advice and information during the presentation of these cases. He returned to the jury room upon request of the jury to answer specific questions during the presentation of some cases and he also discussed the problems concerning Selective Service matters with the members of the Grand Jury during recess breaks.

The witnesses for the government were Dorothy A. Gourdin and Dorothy A. Wheeler, both executive secretaries for the local boards in the Western New York area. Before the witnesses appeared before the Grand Jury, summary sheets were prepared, some by the witnesses and some by other individuals, setting forth a summary of the information contained in the Selective Service files. The cases were presented to the Grand Jury in packages of five or six. After a witness testified on five or six files, she left the Grand Jury room and a vote was taken on whether to indict. In no cases did the jurors have proposed indictments before them and true bills were voted in each and every case.

Mr. Elfvin explains that after the cases were presented, "the witnesses' transcripts were obtained on an expedited basis and [he] and Mr. Williams consulted upon the preparation of the indictments; that 98 had been prepared and approved by [Mr. Elfvin] and by the foreman of the grand jury by December 5, 1972 and were on that day returned to the Court; that the remaining 55 indictments had been prepared and approved by [Mr. Elfvin] and the foreman by December 12, 1972 and were then handed up to the Court, . . . "

## THE MANNER OF CASE PRESENTATION BEFORE GRAND JURY

The United States Attorney has filed a table setting forth the time and date of presentation of each case to the Grand Jury. At least 18 cases were submitted on November 14, 20 on November 15, 42 on November 16 and almost 60 cases were presented on November 17. On November 17, the presentation started at 10:15 A.M. and concluded at about 3:00 P.M., with a luncheon break. The United States Attorney admits that almost 60 cases were submitted to the Grand Jury on that day, during a three-hour period.

The fifth amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." The purpose of a Grand Jury indictment has historically been to charge individuals with serious crimes and to protect people from false accusations brought by others. *See* United States v. DeCavalcante, 440 F.2d 1264 (3d Cir. 1971), 62 Harv.L. Rev. 111, 114 (1948). "The Grand Jury is a safeguard designed to protect the reputation of the accused, to avert the stigma of prosecution unless there is reasonable ground for proceeding." 62 Harv.L.Rev. 111, 114 (1948).

The time given for consideration of each indictment demonstrates little regard for the rights of defendants. In a number of cases the witness was asked by a Grand Juror for details of a registrant's claim and received a brief, conclusory answer. In the case of *Winkelsas*, CR. 72–376, a Grand Juror asked about the nature of the registrant's conscientious objector claim and received the reply:

> [O]n his religious background, there is nothing in here that shows what his religion was at that appearance.

The answer leads the Grand Jury to believe religion is the relevant focus of inquiry on a conscientious objector claim, contrary to the legal requirements, *see* United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

An examination of the transcripts reveals that very little information was

given to the Grand Jury. In almost every case, the transcript begins with the stock phrase which was not recited during the testimony of the executive secretary but was typed in afterward.[2] The total time of presentation was less than one-half minute in many cases. In *Hart,* CR. 72–292, the witness's explanation of the case was limited to three and one-half lines. It is difficult to find any evidence of willful misconduct spelled out in most of the testimony because the executive secretary merely stated "he failed to report." No other information about the failure is submitted to the jury. It is impossible to tell whether the failure to report was brought on by a willful act of the defendant, or because of carelessness, mistake or misunderstanding of the Board's order. Not untypical presentations are those of *Mangione,* CR. 72–300, eight lines; *Bishop,* CR. 72–298, seven lines; *Bialaszewski,* CR. 72–301, ten lines, and *Burke,* CR. 72–319, seven lines. In the case of *Finch,* CR. 72–316, the defendant's claim for ministerial classification was rejected by the Board and he was classified as a conscientious objector, but the complete explanation of this rather complex claim is given in six lines.

In some cases, the jury was misinformed because it was led to believe at the time of presentation that a defendant would be indicted on only one count when in fact he was indicted on two or more. This occurred in *Stysick,* CR. 72–293, *Keith,* CR. 72–404, and *Donohue,*

CR. 72–441. *Stysick* was indicted for failure to "report for and submit to induction" on January 20, 1971 and for failure to "submit to induction" on March 15, 1971. The Grand Jury transcript reads:

On July 13th, 1970, he was mailed and ordered [sic] to report for induction. He transferred this induction to a local board in Los Angeles, California. However, he returned to the Buffalo area so the local board in Buffalo rescheduled him for induction to report October 14th, 1970, at which time he failed to report. He notified the local board that he was ill. On October 21, 1970, he was mailed another letter to report for induction November 4th, 1970. On this date he reported. However, his acceptability was undetermined. On November 23, 1970, he was found to still be fully acceptable. He was rescheduled to report for induction on January 20th, 1971. He failed to report for induction. On March 4th, 1971, at the request of the United States Attorney, the registrant was scheduled to report for induction for March 15, 1971. He reported for induction on that date, but refused to submit.

The Grand Jurors' questioning related only to a congressional inquiry concerning registrant's health.

Neither does the *Petersen,* CR. 72–373, transcript indicate that the government was seeking indictment on multiple

---

2. For example, in the case of Renner, CR. 72–307, the transcript reads:

Q. Miss Gourdin, you're the executive secretary of the Selective Service Board, is that correct?

A. Yes.

Q. And in that capacity, Miss Gourdin, you are the custodian of the Selective Service records of Normand David Renner?

A. Yes, sir.

Q. And such records are maintained in the ordinary course of the business of the Selective Service Board, and it is in the ordinary course of the business of the board to maintain such Selective Service records?

A. Yes, sir.

Q. Miss Gourdin, did there come a time when Normand David Renner registered with his local Selective Service Board?

A. Yes.

Q. And, what, if anything, happened subsequent thereto?

A. He was classified 1–A on July 1st, 1970, he was mailed and ordered to report for a physical examination for September 9th, 1970. He failed to report. He was then scheduled to report for induction on October 21st, 1970. He failed to report.

Page 3 of the *Renner* transcript, where the heart of the government's case is set forth, consists of only five lines.

counts, nor what the punitive consequences of such indictment would be:

He was classified 1–A on . . . September 10th, 1969. On April 30, 1970, he submitted a request to the local board for the special form for conscientious objector. This form was mailed to him. [H]e didn't return it. On September 17th, 1970, he was ordered to report for physical examination for October 1st, 1970, for which he failed to report. On October 19, 1970, he submitted a request to the local board for special form for conscientious objector. He was given the form and did not return it again. On January 14, 1971, he requested the special form for conscientious objector which was mailed to him. On January 21st, 1971, he was mailed an order to report for induction for February 2nd, 1971. On February 1st, 1971, he returned the special form for conscientious objector to the local board. His induction was postponed for the local board to review his conscientious objector claim. He appeared before this local board for an interview on February 10th, 1971, at which time no change was made in his classification. He was rescheduled for induction March 2nd, 1971. He reported but refused to submit.

There were no questions. *Petersen* was indicted for failure to report for a physical examination October 1, 1970, and for failure to submit to induction March 2, 1971.

In the *Keith* case, after the witness, Dorothy Wheeler, recited the data contained in registrant's Selective Service file, the following exchange took place.

A JUROR: Do you know if there had been an indictment for each [failure to report]?

MR. WILLIAMS: No, there will be an indictment for reporting on one occasion.

A JUROR: Only one?

MR. WILLIAMS: Only one.

*Keith's* indictment consists of five separate counts charging failure to report for induction on different dates.

In *Donohue*, a similar situation occurred:

MS. WHEELER: On December 16th, 1969, he was classified 1–A. Notice of this classification was mailed to him on December 17th, 1969. No appeal was made on this classification. He was ordered to report for a physical examination on February 4th, 1970, April 10th, 1970 and August 21st, 1970. On each date he failed to appear for this physical. He was ordered for induction which was mailed to him August 27th, 1970, to report September 9th, 1970, and he failed to report for induction.

A JUROR: If he [sic] indict, do we indict him on five counts?

MR. WILLIAMS: No, one count as failure to report for induction.

*Donohue* was subsequently indicted on three counts of failure to report for a physical examination and one count of failure to report for induction.

In addition to the cases mentioned above, defense counsel Collesano claims that he has examined all the 153 transcripts and that in 38 of the cases the defendants were indicted for multiple counts. In only one case, *Stickney*, CR. 72–440 (later dismissed by the government), presented to the Grand Jury on November 14, 1972, was the jury requested to vote for a multiple count indictment. In at least two cases, *Keith* and *Donohue, supra*, the Grand Jury was specifically informed that the government wished to prosecute for only one offense. Thus, there is a serious question raised about whether the jury would have voted multiple counts if the indictment was in front of them at the time of the vote.

 The above procedural pattern must be considered in light of the requirement that in a multiple count indictment each count must be considered

as a separate indictment for purposes of ascertaining its sufficiency. *See* United States v. Branan, 457 F.2d 1062, 1065 (6th Cir. 1972). It is apparent that the hasty presentation of these cases en masse to the Grand Jury and the lack of preparation in individual cases deprived defendants of their protection against false accusations.

### ERRORS DURING GRAND JURY TESTIMONY

■ Although the government admits that Colonel Silverberg appeared un-*sworn* before the Grand Jury, it argues that Rule 6(d), Federal Rules of Criminal Procedure, and Martin v. United States, 266 F.2d 97, 99 (5th Cir. 1959), do not require dismissal of an indictment because of this defect in the procedure. After making his initial presentation, Colonel Silverberg returned to the jury room during the presentation of the cases against *Bailey*, CR. 72–417, *Stickney*, CR. 72–440, *Kauffman*, CR. 72–333, and *Cavanaugh*, CR. 72–372. In the *Cavanaugh* case, his remarks were not recorded by the reporter. It is clear that no witnesses testified when an outsider was present in the precedent relied upon by the government (Martin v. United States, *supra*), a situation different from the one under consideration. Nevertheless, the government contends that his remarks were non-accusational and that no prejudice accrued to the defendant. In United States v. Borys, 169 F.Supp. 366 (D.Alaska 1959), and in United States v. Carper, 116 F.Supp. 817 (D.D.C.1953), the courts held that defendants are not required to show that they were prejudiced by the presence of unauthorized individuals in the Grand Jury room. Further, "[t]he potential

for undue influence, if that be the test, is made greater by the fact that the unauthorized person . . . was a government agent who possessed personal knowledge of the evidence being presented." United States v. Bowdach, 324 F. Supp. 123, 124 (S.D.Fla.1971). Colonel Silverberg's presence cannot be justified as an attorney for the government. "The term 'attorneys for the government' is restrictive in its application and does not include the attorneys for the administrative agencies." In re Grand Jury Proceedings, 309 F.2d 440, 443 (3d Cir. 1962). There is also the possibility that the presence of Colonel Silverberg influenced the testimony of the Selective Service Board employees. *See Bailey*, CR. 72–417 (Tr. at 14). Although the testimony of the Selective Service witnesses should not have been available to Colonel Silverberg, In re Grand Jury Proceedings, *supra*, it was obvious by his presence in the Grand Jury room that such confidentiality was not maintained.

■ During the presentation of the *Bailey* indictment, CR. 72–417 (Tr. at 14), certain remarks were made by Colonel Silverberg to the Grand Jury, but not recorded. It also appears to the court from the government's presentation that he made off-the-record remarks in other cases. This ground alone is not sufficient to dismiss an indictment in the absence of prejudice to the defendant, United States v. Peden, 472 F.2d 583 (2d Cir. 1973), or unless there is evidence of prosecutorial misconduct, United States v. Cramer, 447 F.2d 210, 214 (2d Cir. 1971). There are instances where Colonel Silverberg left a false impression when his remarks were recorded, *see Bailey* Tr. at 19, et seq.[3]

---

3. A perusal of Colonel Silverberg's testimony discloses these examples of bad information:
 . . . I believe that it's common knowledge, [that] a Jehovah Witness will *not serve under any circumstances, even though he's classified as a 1–O* . . . ..
 Silverberg remarks to Grand Jury at 7 (Government's Exhibit 7).
 It's an administrative process to supply men for the armed forces. It's an obliga-

tion that we males have . . .. It's an obligation these people had, they saw fit not to take it, not to abide by the law of the land, and therefore they're being presented to you for indictment.
 *Id.* at 8, 9.
The inference left with the Grand Jury is one of guilt; nothing remains for the Grand Jurors' own evaluation.

He told the jurors that the United States Attorney's judgment in bringing cases for prosecution should be greatly relied upon. Although it may not be possible to prove prejudice as to each individual indictment because of these off-the-record remarks, nevertheless there is a good argument that the jury's action in other cases was influenced, especially because the cases were submitted all at one time.

■ In the government's bill of particulars, paragraphs V and VII, an account of the procedures used before the Grand Jury with respect to the Selective Service files is given. It is stated that in most cases true photostatic copies were available for examination by the Grand Jury. In the remaining cases, the original file was produced. None of the files was admitted in evidence; proper authentication procedures were not followed. There was a "packaging" of presentations in that one witness prepared herself for five or six cases and testified as to the differing factual allegations contained in each. It is unclear whether the witness prepared herself from notes on the Selective Service files or from the files in her possession while in the Grand Jury room.[4] For the most part, the witnesses did not have first-hand knowledge of the files. Under certain conditions, hearsay testimony may be admissible before the Grand Jury. *See* United States v. Estepa, 471 F.2d 1132, 1136 (2d Cir. 1972). However, it has been held that that Grand Jury must not be misled into thinking it is getting first-hand information when it is actually getting a hearsay account, United States v. Estepa, *supra.* In the presentation of these cases, the Grand Jury was not informed about the actual responsibilities of Miss Gourdin and Miss Wheeler. The Grand Jury was not informed that their sole contact with most of the files was to conduct a review for the purpose of preparing themselves to testify before the Grand Jury. The Local Boards employing Misses Gourdin and Wheeler had no contact with three defendants (*Hamilton, Tomljenovich* and *Robillard*). In spite of the limited contact which these witnesses had with the Selective Service files, the Grand Jury was given the impression that as "executive secretaries" they had first-hand familiarity with the Selective Service status of the defendants.

## GRAND JURY UNAWARE OF INDICTMENTS IN THEIR FINAL FORM

The government admits that "the indictments . . . had not been prepared and were not in form at the time of the body's voting upon the particular cases . . . ." In other words, the foreman of the Grand Jury was the only juror to view the final indictments. In Gaither v. United States, 134 U.S.App. D.C. 154, 413 F.2d 1061 (1969), the court stated:

> Upon a defendant's motion to dismiss the indictment because only the foreman had ratified it, the foreman's signature should raise a presumption that the indictment reflects the will of the grand jury. In order to attack that presumption, the defense should have access to the grand jury minutes. If on the basis of those minutes and the presentment voted by the grand jury the defense can show a *reasonable possibility* that the jurors would not have approved of the indictment actually returned to court, but would have insisted on an indictment different in some material respect, the indictment should be dismissed.

*Id.* at 1073 (Emphasis added).

This court, in accepting the *Gaither* formulation, finds a reasonable possibility that at least in some cases the jurors would not have approved of the actually returned indictments. The handling of the multiple count indictments is illus-

---

4. Gourdin and Wheeler "and said other personnel from the Selective Service Boards including said attorneys [Silverberg and re- servists], prepared summary sheets relative to each such file."

trative of the confusion characterizing many of the presentations. In the case of *Stysick*, CR. 72–293, testimony along with grand jurors' questions indicates that the jurors were not informed of and did not understand that multiple count indictments would be returned.

In other cases, there is a possibility that jurors would have insisted upon a different indictment. Willfulness was not made out by the government in many cases. In *Dirks*, CR. 72–371, the Assistant United States Attorney told the jury that the Selective Service witness was not in a position to answer the question about the validity of the conscientious objector claim. Much of the information in *Dirks*, *Winkelsas*, CR. 72–376, *see* discussion *supra*, *Keith*, CR. 72–404, and similar cases, if brought to the attention of the jury, would have perhaps created a doubt as to whether or not the defendant acted willfully in refusing to obey the order of the Board. In *Biggar*, CR. 72–390, the indictment charged willful and knowing defiance of the physical examination order and induction order. Yet, the testimony was as follows:

MISS GOURDIN: He was classified 1–A on December 15, 1970. He was mailed a physical notice for January 13, 1971. It was returned by his family to the Local Board. He was then ordered to report for induction on February 4, 1971. The induction was returned also. He failed to report.

\* \* \* \* \* \*

A JUROR: Did his family give any reason or statement of his whereabouts?

THE WITNESS: They didn't. They said that they didn't know where he was.

In still other cases, there is uncertainty that the grand jurors would have approved the indictments in final form because of the entire hasty procedure, the packaging of presentations and the fact that the individual Selective Service files were not in the jury room.

DELAY

In the government's table showing prosecutive delay, an average period of over twenty months between referral and indictment is indicated. The general explanation offered for this delay is that it was caused by lack of manpower and the review necessitated by pending Supreme Court decisions. The decisions cited by the government were decided before the alleged offenses in most of the current cases: Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L. Ed.2d 532 (January 19, 1970); Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, and Mulloy v. United States, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (June 15, 1970); United States v. Lenhard, 437 F.2d 936 (2d Cir.) (December 11, 1970); Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (April 21, 1971). Assuming each case was reevaluated in light of these decisions, there was still a year and one-half delay between April 1971 and December 5 and 12, 1972, the dates of the return of the indictments in question. Neither is the manpower shortage explanation persuasive. Other cases were brought for indictment and trial during the time period in question. When a determination was finally made to return indictments, the United States Attorney was able to get help from the Regional Counsel of the Selective Service System and other attorneys. There is no reason to suppose that this could not have been done at an earlier time.

The government also cites "various independent causes of delay" alleged for individual cases. A summary of the factual situations in a few of these cases will serve to test the validity of this set of reasons. In the case of *DiCioccio*, CR. 72–415, the government points to "delay pending efforts by the FBI to interview the registrant to ascertain if he would submit if re-ordered." DiCioccio refused induction February 22, 1971 stating that he was a conscientious objector. The refusal was reported to the United States Attorney and on March 9, 1971 SSS Form 301 (Delin-

quent Registrant Report) was mailed to the United States Attorney. The FBI's apparent first contact with DiCioccio was on August 10, 1971. It is not explained why the FBI's efforts were "pending" between March and August 1971 before any attempt was made to contact DiCioccio, who lived at the same address which was properly on file with his local board. Further, there is an unexplained sixteen month period between August 1971 and indictment.

Conferences with registrant's attorney concerning procedural errors are cited for delay in the *Landrum* case, CR. 72–326. Defense Counsel Carmin Putrino, upon examination of his correspondence has provided the following account. On May 14, 1971 counsel wrote the then United States Attorney, H. Kenneth Schroeder, Jr., alleging procedural errors. On May 18, 1971 Assistant United States Attorney Ronald Fancher replied; a meeting was held on or about June 23, 1971. No reply to the inquiries raised at that meeting was received until December 23, 1971, at which time Assistant United States Attorney James Grable asked for another meeting. Following a telephone conversation with Grable, counsel prepared a letter outlining the procedural errors, which was forwarded on March 20, 1972. No reply to this letter was received.

In the matter of *Grawe*, CR. 72–378, delay purportedly resulted from Grawe's having "agreed to submit and then refused." Grawe submitted an "Apprentice Deferment Request" about the time of his initial induction order (June 15, 1970). A new order followed this request, and the SSS Form 301 was sent to the United States Attorney on July 29, 1970. Thereafter, Grawe was interviewed by an FBI agent at his residence on November 30, 1970, at which time he stated that he had received the notice for induction and that he did not report because he was applying for an apprentice deferment. The registrant further stated that he would recontact his draft board "concerning the status of his ap-

prentice deferment," but that if another induction order was sent to him, "he did not know at this time whether or not he would be willing to be inducted."

While it is true that the sixth amendment's guarantee of a speedy trial is applicable only after a person has been "accused" of a crime, United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court refused to find a constitutional basis "for holding that the speedy trial right can be quantified into a specific number of days or months." 407 U.S. at 523, 92 S.Ct. at 2187. Nevertheless, in Dickey v. Florida, 398 U.S. 30, 38, 90 S.Ct. 1564, 1569, 26 L.Ed.2d 26 (1970), the Court held that "the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial." In the same case, Justice Brennan, concurring, identified three factors for consideration: the source of the delay, the reasons for it, and whether there is potential for prejudice to the defendant. 398 U.S. at 52, 90 S.Ct. 1564.

In United States v. Hanna, 347 F. Supp. 1010 (D.Del.1972), a post-arrest, pre-indictment delay of eleven months was held to violate the sixth amendment where the delay was for the purpose of serving as an incentive for the defendant to testify in the trial of another, a reason unconnected with and unnecessary to preparation of the government's case against defendant. In reaching its decision, the court rejected the argument that the relevant period for measuring delay should begin at the time of the alleged offense, citing "[t]here is no constitutional right to be arrested," Hoffa v. United States, 385 U.S. 293, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966).

█ Few, if any, arrests were made prior to the return of the instant indictments. However, in measuring delay, this court will begin at the time of referral of these cases for prosecution

from the Selective Service Boards due to the special statutory mandate regarding prosecution of Selective Service cases. 50 U.S.C. App. § 462(c) provides:

> The Department of Justice shall proceed as expeditiously as possible with a prosecution under this section, or with an appeal, upon the request of the Director of the Selective Service System or shall advise the House of Representatives and the Senate in writing the reasons for its failure to do so.

The legislative history of this section states that "[t]he committee believes that enactment of this provision will create a sense of urgency in the Department of Justice in respect to violations of the Selective Service Act" 1967 U.S. Code Cong. & Admin.News 1967, p. 1333. In addition, § 462(c) should be read in conjunction with 50 U.S.C. App. § 462(a): "Precedence shall be given by courts to the trial of cases arising under this title, and such cases shall be advanced on the docket for immediate hearing." In United States v. Dyson, 469 F.2d 735 (5th Cir. 1972), it was recognized that § 462(a) and (c) provide a *statutory* guarantee of an expeditious trial, a statutory standard recognized to be more stringent than that constitutionally demanded.

■ If this court were to base this portion of its holding on purely sixth amendment grounds, prejudice to the defendants resulting from the delay would have to be made out. Arguing that actual prejudice has accrued, defense counsel point to various incidents of the delay in indictments. It is claimed that certain defendants have been restricted in their movements by the pendency of prosecution; that certain defendants, who would have been less than 26 years at sentencing if promptly indicted and tried, are now 26 or will be so prior to trial, and that the government has lost certain documents. Further, prejudice to the defendants is alleged due to the very nature of a Selective Service case. Since the government's burden in a Selective Service case can often be met with documentary evidence, *see* United States v. Lavin, 480 F.2d 657 (2d Cir. 1973), its case does not deteriorate with age. On the other hand, the defendant, who carries the burden of going forward, must contend with fading memories, lost evidence and unlocatable witnesses. These general allegations could constitute actual prejudice if proven in the individual cases. But we hold that it is not defendants' burden to prove prejudice. "Where the delay is not only excessive but the result of unexcused inaction or misconduct by the Government, it is prima facie prejudicial." United States v. Dyson, *supra*, 469 F.2d at 741. The government has failed to rebut prejudice.

## CONCLUSION

■ Considering all of the circumstances surrounding the presentation of these cases to the Grand Jury, the indictments cannot stand. It is apparent that in its haste to finally bring these indictments, the government impinged upon the rights of the individual defendants.

From the first moment when the United States Attorney undertook to present these cases to the Grand Jury, the rights of individual defendants were sacrificed to considerations of haste and a wholesale disposition of many files. These 153 cases along with many others were allowed to languish in the files of the United States Attorney's office without attention for many months. Because of the hurried manner of presentation, many mistakes were made, many indictments were returned which should not have been, and it would be almost impossible for the jury to separate the facts in one case from those of another. The brief summaries used by the witnesses in their presentation usually only informed the jurors that the registrant was classified 1–A and failed to report. In complicated situations, misleading information was often given to the jurors or the jurors' questions were brushed aside. Most of the original Selective

Service files were not available for examination and, at the time of voting, the jury did not have any indictment in final form. The hearsay nature of the Local Board witnesses' testimony was not made clear to the jury. The Regional Counsel for the Selective Service System was present before the Grand Jury, but neither as a witness nor an attorney. His presence was unauthorized and seriously infected the presentation of all of the cases. He discussed some of the cases off the record with members of the Grand Jury and, in several instances, gave misleading answers to jurors' questions. The jury was misled in many cases about the number of counts which would appear in the final indictment. It appears to the court that in many cases the jury would probably not have voted the indictment as it was prepared in final form. Considering all of the circumstances attendant upon the presentation of these cases, there is no alternative left to the court but to dismiss all indictments which were filed on December 5, 1972 and December 12, 1972 in these Selective Service cases which are still pending.

Defense counsel argue that the indictments should be dismissed with prejudice. However, the court finds that the allegations made by defense counsel of lost records, unavailability of witnesses and diminished recollections are not supported by specific facts. As the court has attempted to make clear in this decision, the government's shotgun approach to bringing these indictments was a process which seriously infringed upon the rights of individual defendants. Nevertheless, whether or not the failure of the government to proceed expeditiously in these cases was serious enough to prevent any indictment in particular cases should await further proceedings.

For the foregoing reasons, the indictments under consideration are hereby dismissed.

So ordered.