UNITED STATES of America

v.

Edward PASTOR and Martin
Weiner, Defendants.

Nos. 75 CR. 753, 76 CR. 253 and
76 CR. 145.

United States District Court,
S. D. New York.

Nov. 5, 1975.

On Motion to Dismiss Indictment
Feb. 19, 1976.

On Omnibus Motion May 11, 1976.

On Subsequent Motion to Dismiss
May 26, 1976.

Thomas J. Cahill and Robert B. Fiske, Jr., U. S. Attys. by John Timbers, Asst. U. S. Atty., New York City, for U. S.

Kuh, Shapiro, Goldman, Cooperman & Levitt, P. C. by Richard H. Kuh, Andrew R. Cooper, Peter Lushing, New York City, for Edward Pastor.

Eckell, Sparks, Vadino, Auerbach & Monte by W. Donald Sparks, Media, Pa., for Martin Weiner.

## MEMORANDUM OPINION AND ORDER

MOTLEY, District Judge.

Defendants in this case have moved to compel the Government to produce "*all* statements purportedly made by the defendants upon which the Government intends to rely at the trial of this case." (Letter of October 28, 1975 from Richard H. Kuh) (emphasis in original). They do not, at this time, seek "the entire statements of witnesses, nor for attribution to particular witnesses, but merely seek copies of (or the gravamen of) all statements allegedly made *by the defendants* upon which the Government will rely." (*Id.*; emphasis in original).

Apparently, the Government has agreed to produce statements allegedly made by defendant Pastor to Drug Enforcement Administration agents, but has resisted the production of statements allegedly made by the defendants to non-governmental third parties during the course of the conspiracy, contending that such statements are "3500 material" (18 U.S.C. § 3500) which need not be produced until trial. Defendants argue that the plain language of Rule 16(a) of the Federal Rules of Criminal Procedure requires that the Government produce the requested materials, and relies on a series of cases dealing with the scope of Rule 16(a) and—to a certain extent—with its interaction with 18 U.S.C. § 3500. In rejoinder, the Government argues that *U. S. v. Perce-*

*vault,* 490 F.2d 126 (2d Cir. 1974) is dispositive of the issue in this case and requires that defendants' motion be denied.

■ The precise point of contention appears to be whether a liberal reading of Rule 16(a) entitles the defendant in a criminal trial, before trial, to inspect and copy statements made by him that are contained in statements made by non-governmental third parties which are within the possession, custody or control of the Government, and upon which the Government intends to rely at trial. The court concludes that the defendants are not entitled to such discovery.

*Percevault, supra,* dealt with a somewhat different question, specifically whether Rule 16(a) entitled the defendants to pretrial discovery of the statements of prospective witnesses which would be *treated* at trial as the defendant's own statements through the vicarious admission exception to the hearsay rule. Reversing the District Court, the Court of Appeals held that the language of Rule 16(a) did not permit such liberal discovery, especially in view of the strictures of 18 U.S.C. § 3500. However, the court did not have before it the specific question raised in this case, where the statements sought are those of the defendant himself, as allegedly related by a third party.

The precise issue here involved was thoroughly discussed in *U. S. v. Feinberg,* 371 F.Supp. 1205 (N.D.Ill.1974), a case in which Judge Marshall concluded that the defendant was entitled to such discovery. However, the Court of Appeals for the Seventh Circuit reversed this decision in a persuasive opinion, *U. S. v. Feinberg,* 502 F.2d 1180 (1974). The Court cited with approval, *inter alia, U. S. v. Dorfman,* 53 F.R.D. 477 (S.D.N.Y.1971), *aff'd,* 470 F.2d 246 (2d Cir. 1972), in which Judge Gurfein had refused to allow pretrial discovery of witnesses' written statements which purportedly contained oral statements made to them by the defendant.

In concluding that 18 U.S.C. § 3500 barred pretrial discovery of the requested statements, the Court of Appeals in *Fein-*

*berg* also referred to the recent amendment to Rule 16 of the Rules of Criminal Procedure, which are now scheduled to become effective on December 1, 1975. As proposed by the Supreme Court and enacted into law, Pub.L.No.94–64, 89 Stat. 370, the revised Rule 16(a)(1)(A) will require the Government to "permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged."

Both the notes of the Supreme Court's Advisory Committee, 62 F.R.D. 307, and the Congressional legislative history of the revision, *see* 1975 *U.S.Code Cong. and Admin. News* 1368, 1390, make clear that even this limited provision represents an expansion of the scope of pretrial discovery available to criminal defendants under existing federal law. To the extent that the law may differ among the circuits, there presently appears to be no clear warrant in the Second Circuit for granting discovery beyond the scope of that which will be permitted by the amended Rule 16 as of December 1. However, it would seem unduly restrictive, in view of the fact that trial of this case will occur well *after* December 1, to grant any *less* discovery than that which will soon be clearly permissible under amended Rule 16.

Accordingly, the Government is ordered to produce any and all materials to which defendants are entitled under the provisions of amended Rule 16 as set forth, *supra.* The Government is not required to produce the substance of oral statements purportedly made by the defendants and contained in

statements of third parties *except* as provided by the provisions of amended Rule 16.

SO ORDERED.

### On Motion To Dismiss Indictment

Defendants were originally indicted on July 31, 1975 and charged in four counts with violating the Federal Controlled Substances Act[1] and in a separate count with conspiracy so to do.[2]

Thereafter, on February 11, 1976, a new and different Grand Jury returned a superseding indictment. The second indictment charged an additional substantive violation of the Controlled Substances Act allegedly occurring about the time that the other substantive charges occurred.

In addition, the superseding indictment made certain other changes. In Count 1, the conspiracy count, the superseding indictment alleges that the conspiracy took place in "the Southern District of New York and elsewhere". The original indictment had charged that the conspiracy occurred in the Southern District of New York. In Overt Act 5 of Count 1, the alleged number of phendimetrazine tablets was changed to read "one million" instead of "two million" as originally charged. Overt Act 6 in the new indictment deleted a reference to Philadelphia as the place where the alleged forgery of a signature took place. The date in Overt Act 7 was changed to read, "In or about 1974, at the APA Transport terminal in Philadelphia", instead of "In or about 1973, in the APA Transport terminal in Philadelphia," originally alleged. In Count 2 "100,000 phendimetrazine tablets" was changed to read "100,000 phendimetrazine capsules" in the second indictment. In Count 3, "In or about September, 1973" was changed to read in the superseding indictment, "In or about August 1973", and the number of phendimetrazine tablets was changed to read "2,000,000 phendimetrazine tablets" in lieu of "250,000." In Count 4, the original indictment reads, "From October 1973 up to and including June 1974" defendants obtained possession of "980,000 phendimetrazine tablets" in the Southern District of New York, whereas the superseding indictment changed the dates to read, "In or about September and October 1973", and the number of tablets was changed to read "250,000 phendimetrazine capsules."

█ Defendants made an oral motion to dismiss the superseding indictment on February 18, 1976 on the ground that the indictment had been returned by a Grand Jury which had been presented with hearsay evidence in violation of the Second Circuit's decision in *United States v. Estepa*, 471 F.2d 1132 (1972). Defendants also relied upon *United States v. Gallo*, 394 F.Supp. 310 (D.Conn.1975).

The Assistant United States Attorney, in response to the motion, candidly advised the court on the record substantially as follows: When the matter was presented to the original Grand Jury, Charles Fernald, an alleged unindicted co-conspirator, testified before the Grand Jury concerning nine separate transactions. Other witnesses were also presented to the original Grand Jury. In presenting the matter to a new and different Grand Jury in February 1976, the jury heard only one live witness. That witness was Charles Fernald who testified regarding a 10th transaction only. The Grand Jury was presented with a transcription of Charles Fernald's testimony before the original Grand Jury regarding the other nine transactions. The Assistant United States Attorney frankly admitted that he failed to advise the Grand Jury specifically that it was free to question Charles Fernald about his prior testimony. The Assistant did ask the jury whether it had any questions for Mr. Fernald, but he did not make clear to the jury that it was free to demand live testimony before it from Mr. Fernald rather than rely upon the cold record. The Grand Jury had no questions for Mr. Fernald and returned the superseding indictment.

---

1. Title 21, U.S.C. §§ 812, 841(a)(1), 843(a)(2) and 843(a)(3).

2. Title 21, U.S.C. § 846.

In *United States v. Estepa, supra,* the Second Circuit ruled: "We have previously condemned the casual attitude with respect to the presentation of evidence to a grand jury manifested by the decision of the Assistant United States Attorney to rely on testimony of the law enforcement officer who knew least, rather than subject the other officers, or himself, to some minor inconvenience" (at 1135).

The Second Circuit admonished that, "When the framers of the Bill of Rights directed in the Fifth Amendment that 'No person shall be held to answer for a capital, or other infamous crime, unless on a presentation or indictment of a Grand Jury,' they were not engaging in a mere verbal exercise" (at 1136).

It also reminded United States prosecutors that "The importance of avoiding undue reliance upon hearsay before a grand jury is heightened by this circuit's view that an indictment constitutes a finding of probable cause and avoids the need for a preliminary hearing under F.R.Cr.P. 5(c)" (at 1136).

In failing to advise the Grand Jury that it could question Mr. Fernald regarding his prior testimony or have him testify before them as to those transactions, the Grand Jury which returned the superseding indictment may well have been misled as to "the shoddy merchandise they [were] getting so they [could] seek something better if they wished." *United States v. Estepa,* at 1137.

The court finds that in this case the Assistant United States Attorney unwittingly violated the direction of the Second Circuit that the Grand Jury not be deceived as to the shoddy merchandise it was getting.

In *United States v. Gallo, supra,* my brother Zampano correctly observed, as the courts have previously held, that the accused has a right to have a Grand Jury make the charge on its own judgment. This includes the right to have the Grand Jury make its own evaluation of the credibility of an important Government witness. The court agrees that what effectively occurred here was a rubber stamp action by

the second Grand Jury. *United States v. Gallo,* at 314.

As my brother Zampano further pointed out in *Gallo,* in *United States v. Umans,* 368 F.2d 725 (2d Cir. 1966), the Second Circuit specifically mandated that hearsay evidence should only be used when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge. Mr. Fernald was present and could easily have testified before the second Grand Jury. The prosecutor admittedly did not enlighten the Grand Jury as to the hearsay quality of the bulk of the evidence they were receiving. The prosecutor also failed to advise the Grand Jury that Mr. Fernald could be questioned by them concerning his prior testimony or testify regarding all other transactions so that they might evaluate his credibility.

█ Finally, the prosecutor's action here resulted, unwittingly, in depriving defendants of Jones Act, "3500 material," which would have emanated from testimony of Mr. Fernald before a second Grand Jury. *Cf. United States v. Ramirez,* 482 F.2d 807, 813 (2d Cir. 1973). As the Second Circuit said in *United States v. Borelli,* 336 F.2d 376 (1964), the Government ought not to be allowed to deprive a defendant of his right to impeachment by contradiction.

For all of the foregoing reasons the motion to dismiss the second indictment must be granted.

### ON OMNIBUS MOTION

Defendants Edward Pastor and Martin Weiner have presented the court with an omnibus motion supplementary to their previous omnibus motion, which was filed on January 5, 1976. The requests embodied in this more recent motion will be dealt with *seriatim.*

### I.

Defendants have moved, pursuant to Rule 12, Fed.R.Crim.P., and on the authority of *United States v. Strewl,* 99 F.2d 474 (2d Cir. 1938), *cert. den.,* 306 U.S. 638, 59 S.Ct. 489, 83 L.Ed. 1039, *reh. den.,* 306 U.S.

668, 59 S.Ct. 590, 83 L.Ed. 1063 (1939), for an order dismissing the original indictment in this case, 75 Cr. 753, which was filed on July 31, 1975, and which has been "superseded" by another indictment, 76 Cr. 253, which was filed on March 12, 1976. Both indictments allege that defendants conspired to violate Sections 812, 841(a)(1), 843(a)(2), and 843(a)(3) of Title 21, United States Code, and that they committed certain substantive offenses in violation of 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2. The superseding indictment differs from the original indictment in that it contains one additional substantive count and makes changes in several dates, numbers, places and other items.

The crucial passage from the *Strewl* case, relied upon by defendants, is as follows (at 477):

> "It is true that if the defendant has pleaded to the first indictment, the court will ordinarily quash it to insure his protection from double jeopardy (*United States v. Maloney,* Fed.Cas.No.15,713a); but it does not here appear that Strewl had ever pleaded to the first indictment, and if he had, it would make no difference, because in any event an order was necessary."

In opposing this motion, the Government, in turn, relies on the following passage from *Strewl* (at 477), part of which precedes and part of which follows the previous quotation:

> "The 1934 indictment was not quashed by the indictment of 1937. The order which 'found' it 'insufficient' did not attempt to dismiss it; and although a second indictment is often said to 'supersede' the first, it does not dispose of it without an express quashal. . . . As things were, both indictments stood and the prosecution was free to elect on which to proceed."

■■ As the Government points out, the prescription in *Strewl,* that the trial court should quash a "superseded" indictment if the defendant has already "pleaded" to it, is, strictly speaking, dictum; Strewl himself had not "pleaded" to the first indictment.

Moreover, the concern for double jeopardy problems expressed in the quotation is meaningful only if the rule is read to require dismissal of a superseded indictment when a defendant has pleaded *guilty* to the first indictment and thus has been put in jeopardy on that charge. The ordinary rule is that jeopardy only "attaches" in a criminal case when a petit jury is empaneled and sworn, *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); *United States v. Glover,* 506 F.2d 291, 294 (2d Cir. 1974), or, in a non-jury case, when the trial judge begins to hear evidence in the case. *United States v. Jenkins,* 490 F.2d 868, 875 (2d Cir. 1973), *aff'd,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). The fact that a defendant has pleaded *not guilty* to a now superseded indictment does not create any possibility of double jeopardy which requires dismissal of the first indictment at this time. If the Government should attempt to try him on the first indictment after he had already been tried on the second (superseding) indictment, he could clearly raise the defense of double jeopardy at that later date. It is undoubtedly for this reason that the prevailing practice in this judicial district is to require dismissal of superseded indictments only after a conviction or plea on the superseding indictment.

■ Defendants' only other argument against preservation of the original indictment is that "there is no rational basis for artificially keeping [it] alive", and that it is not a "true charge" but merely "a mode of keeping this matter open while [the Government] tinkers with a series of other charges." This is clearly an insubstantial contention, for which defendants have cited no authority. The Government has the right—and indeed the obligation—to go to trial with an indictment which the prosecutor feels accurately represents the circumstances constituting the alleged criminal activity. This court is certainly unable to say that there could be no rational basis for preservation of the original indictment.

The motion to dismiss the original indictment, 75 Cr. 753, is, accordingly, denied.

## II.

Defendants have also moved for an order dismissing the second superseding indictment, 76 Cr. 253, because of allegedly improper statements or comments by the Government attorneys before the grand jury and because of the nature of the evidence presented to the grand jury. Disposition of this branch of their motion must await further inquiry into the grand jury proceedings.

However, defendants have also moved preliminarily, pursuant to Rule 6(e), Fed.R. Crim.P., for an order directing disclosure to them of all proceedings before the grand jury which returned the instant superseding indictment, including those proceedings which antedated the return by that same grand jury of a "No True Bill". In the alternative, they ask that those minutes be disclosed to the court for *in camera* inspection. Inasmuch as the Government has consented to such an *in camera* inspection, no further discussion of this request is necessary. The requested minutes will be delivered to the court no later than May 12, 1976.

Defendants have made a further request, however, which is vigorously opposed by the Government. Based upon the history of the Government's attempts to obtain superseding indictments in this case, as outlined briefly below, defendants ask for a hearing to determine "whether any comments were made, and, if so, the content thereof, by the Government attorneys to the Grand Jury or to any Grand Jurors that were not recorded or transcribed and which may have influenced the decision of the Grand Jury or individual Grand Jurors in their deliberations."

On February 11, 1976, a grand jury, different from the grand jury which had returned the original indictment in July of 1975, returned a superseding indictment identical to the instant indictment. After it had appeared to the court, through admissions of the Assistant United States Attorney assigned to the case, that the evidence presented to this grand jury had consisted in large part of readings of the transcript of prior testimony before the previous grand jury, this court dismissed the indictment so returned for improprieties more fully set forth in the court's opinion dated February 19, 1976. On the following day, apparently after receiving further presentation by the Government, the same grand jury which had voted the February 11 indictment voted not to return a new indictment, but rather to return a No True Bill. At the time the No True Bill was filed on February 20, 1976, however, the foreman of the grand jury requested that the Part I judge either direct the defendants to appear in an identification lineup, or order that a *photographic identification* be held. Upon the judge's order, additional evidence was thereafter presented to the same grand jury, and the second superseding indictment, now before the court, was returned and filed on March 12, 1976.

Based upon this chronology, defendants advance two theories on which they base their request for further inquiry into the prosecutor's conduct before the grand jury. In the first place, they apparently argue that the prosecutor's conduct in obtaining the first superseding indictment (now dismissed) and the speed with which the prosecutor sought to obtain the subsequent indictment both suggest that he may have again utilized the same questionable practices which led to this court's prior dismissal. This court's *in camera* examination of the grand jury transcripts will be adequate to reveal whether hearsay was utilized, whether the grand jurors were advised that they were receiving hearsay evidence, and whether the jurors were advised that they could question any witnesses concerning any previous testimony which they may have delivered to another grand jury.

The only remaining question on this branch of defendants' motion is whether investigation of their second allegation of alleged prosecutorial misconduct before the grand jury merits the requested hearing. Defendants argue that the behavior of the grand jury on February 20, in returning a No True Bill and simultaneously requesting

further identification procedures, is suggestive of either (1) prosecutorial pressure to vote precipitously, only one day after the preceding indictment had been dismissed, or (2) prosecutorial pressure, after the vote had been taken, to have the grand jury take more evidence and reconsider its failure to indict. Moreover, they suggest more generally that the whole course of the proceedings before the grand jury is "inherently unreliable".

■ Determination of this question must begin with a consideration of Rule 6(e), which provides, in relevant part, that persons having knowledge of grand jury proceedings

"may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury."

Thus, the showing of some valid grounds for a motion to dismiss is a precondition to a hearing revealing the grand jury proceedings.

Defendants assert that "improper statements or comments by the Government attorneys to the Grand Jury that prejudice the defendant[s]" constitute grounds for dismissing the indictment. It is true, as the Government notes, that the authority cited by defendants for this proposition, *United States v. Daneals,* 370 F.Supp. 1289, 1296 (W.D.N.Y.1974), does not deal with the specific problem of improper *prosecutorial* comments before the grand jury, but rather with an instance of off-the-record remarks by a Government employee who was improperly present at secret grand jury proceedings, in violation of Rule 6(d), Fed.R. Crim.P. And it is also true that the court in *Daneals* apparently relied upon the cumulative effect of that and other errors in grand jury proceedings to dismiss 150 selective service indictments which were returned in that District after four days of grand jury deliberation. However, despite the somewhat inapposite nature of the citation to *Daneals,* it seems conceivable to the court that some prosecutorial comments before the grand jury could be so clearly improper as to warrant dismissal of an indictment, if the defendants had been prejudiced thereby. The only question at this juncture is whether defendants have made a sufficient showing to warrant a hearing.

The Government argues, first, that even if the prosecutor *had* urged the grand jury to vote precipitously, the defendants were not injured thereby, since the grand jury voted a "No True Bill" anyway. That is certainly true as to that one occasion; however, the broader inquiry suggested by defendants is whether the pressure hypothetically placed upon the grand jurors which was reflected in their February 20 action also led to a vote in favor of indictment on earlier (February 11) and later (March 12) occasions.

The Government also argues, without citation of authority, that, even if the prosecutor attempted to persuade the grand jury to consider more evidence and to reconsider its return of "No True Bill", it had an absolute right to do so. While this may be true as a general principle, the clear implication of the defendants here is that the prosecutor went beyond merely requesting further consideration and exerted undue and improper pressure on a grand jury unwilling to indict. And the prejudice inuring to the defendants from any impropriety here is clear: they were again indicted. It is no answer to say, as the Government contends, that the defendants would have great difficulty in establishing any prejudice at a hearing because the same grand jury and another had already indicted them for virtually identical offenses. The court cannot rule, as a matter of law, that defendants could not show that they were prejudiced under these circumstances.

■ While it is true that the "courts generally have been most cautious in invalidating indictments for alleged grand jury misconduct of the prosecutor," *Beatrice Foods Co. v. United States,* 312 F.2d 29, 39 (8th Cir. 1963), *cert. den.,* 373 U.S. 904, 83

S.Ct. 1289, 10 L.Ed.2d 199 (1963), this court is persuaded that defendants have made a sufficient showing of possible impropriety and resultant prejudice to warrant a hearing to investigate their allegations. *See, United States v. Rintelen*, 235 F. 787, 794 (S.D.N.Y.1916) (Augustus Hand, D. J.) In the court's view, the limited nature of the inquiry requested by defendants will not offend those considerations which have led to the general policy of secrecy for the grand jury proceedings. *See, United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 n.6, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).

The defendants' motion for a hearing is, accordingly, granted. The hearing will be held on Monday, May 17, and will be limited to the question whether there were any improper off-the-record remarks by the prosecutor. Testimony of Assistant United States Attorney Timbers and of the grand jury reporter will be received. The court's ruling that defendants have made the requisite showing to warrant a hearing does not, of course, imply any view on the merits of defendants' ultimate contentions.

### III.

Defendants have next moved, pursuant to Rules 6(f) and 12, Fed.R.Crim.P., for an order directing the production of the attendance records, without divulging the names, of those persons constituting the grand jury which returned the instant indictment, insofar as those records indicate the attendance of each grand juror at sessions that either heard evidence or received instructions bearing upon the alleged criminal activity underlying the instant superseding indictment. Defendants argue, in accordance with the reasoning of *People v. Brinkman*, 205 Misc. 337, 126 N.Y.S.2d 495 (Queens Co.1953), *rev'd*, 286 A.D. 889, 142 N.Y.S.2d 389 (2d Dept.1955), *aff'd*, 309 N.Y. 974, 132 N.E.2d 334 (1956), that if all the jurors who ultimately voted to return the instant indictment were not present to receive all the evidence and instructions bearing on the case, then they were unable to make an informed decision to indict the defendants, and the indictment ought to be dismissed.

Defendants acknowledge, as they must, that the law in this Circuit does not require dismissal of the indictment under those circumstances. *United States ex rel. McCann v. Thompson*, 144 F.2d 604 (2d Cir. 1944), cert. den., 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944), a decision of Judge Learned Hand, early adopted the rule that each of the jurors who ultimately votes for an indictment need not have heard all the evidence which had been presented to the grand jury in the case. Defendants urge, however, that this rule reflects a dated concept of the grand jury's function, and that it does not accord with more recently heightened concern that the grand jury be a vigorous and independent deliberative body, not merely a subject for the manipulation of overzealous prosecutors. They further note that, if the records should show the absence of one or more of the grand jurors from sessions at which the grand jury received evidence or instructions, dismissal of the indictment would not automatically result, if the prosecutor could show, for instance, that the evidence presented to the grand jury on the date of absence was merely cumulative of evidence which the jurors received at other times.

 The court is not persuaded, however, either that the reasoning of *McCann* reflects a benighted conception of the grand jury's function, or that this court is in a position to fly in the face of precedent established by the Court of Appeals. Defendants apparently acknowledge that the rule established in *McCann* has been generally accepted in the federal courts, and not only in this Circuit. The only authority they urge is that of the New York state courts which, though persuasive, is clearly not binding on this court, especially in the face of local federal precedent to the contrary.

More importantly, the reasoning of *McCann* remains persuasive to this court:

> "Since all the evidence adduced before a grand jury—certainly when the accused does not appear—is aimed at proving guilt, the absence of some jurors during

some part of the hearings will ordinarily merely weaken the prosecution's case. If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote. Against this we can think of nothing except the possibility that some of the evidence adduced by the prosecution might conceivably turn out to be favorable to the accused; and that, if the absentees had heard it, they might have refused to vote a true bill. No one can be entirely sure that this can never occur; but it appears to us so remote a chance that it should be left to those instances in which it can be made to appear that the evidence not heard was of that character, in spite of the extreme difficulty of ever proving what was the evidence before a grand jury." 144 F.2d at 607.

The argument of *McCann* is, thus, a practical one. It does not assume that the grand jury is merely to be a mechanism of the prosecutor. To the contrary, it merely presumes that the individual grand jurors are honest and conscientious in their voting, fully cognizant of their oath, but nevertheless sometimes able to find a *prima facie* case on less than all the evidence presented. If this opinion reflects any conclusion concerning the grand jury process which is not in accord with contemporary standards of justice, then it is for the Court of Appeals, not this court, to make an appropriate correction in the law of this Circuit.

The motion to obtain the attendance records of the grand jurors is, accordingly, denied.

### IV.

Defendants have moved, pursuant to Rule 16, Fed.R.Crim.P., for pre-trial discovery of certain evidence. Inasmuch as the Government has indicated that it is presently complying with this request, the court merely orders that all such production be completed no later than May 12, 1976.

### V.

▮ Pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and other federal decisions, defendants have asked for certain exculpatory material concerning two alleged co-conspirators, Ira Sachs and Saul Green. In response, the Government indicates that it intends to adhere to the schedule, previously approved by this court, of producing all material potentially useful for impeaching the Government's witnesses on the night before the witnesses are expected to begin their testimony.

The rationale for this court's prior approval of this schedule was that, since disclosure of this material might disclose the identity of the Government's witnesses prior to trial, the Government need not produce the requested material at this time. *United States v. Cannone*, Slip Opinion No. 142 (2d Cir., decided September 26, 1975). However, since the material requested pertains to two men whose identities are already known to defendants that rationale clearly does not require any further delay in production by the Government. Accordingly, the Government is instructed to turn over to defendants that material which they request in this branch of their notice of motion no later than May 12, 1976.

### VI.

▮ Defendants also ask that the court reconsider its previous decision, embodied in a brief opinion dated February 12, 1976, denying defendants access to certain *Brady* material and a list of the Government's witnesses prior to trial. The court's previous decision was premised upon the contents of an affidavit which the Government had submitted for the court's *in camera* inspection and which, the court held, constituted a sufficient "showing that [disclosure of the identity of the Government's witnesses prior to trial] would not be in the best interests of justice." *Cannone, supra*, at 64.

Defendants argue, first, that the identity of at least six potential witnesses has already been disclosed to them due to the fact that these persons were either named in the indictment, named as unindicted co-conspir-

ators in the Government's supplemental bill of particulars, or, in one case, revealed at a photo identification incident to the grand jury proceedings. Thus, they again argue that the rationale of this court's previous decision has been undercut as to these individuals. The court agrees and, therefore, directs the Government to produce to the defendants no later than May 12, 1976 all materials requested in parts 4(D), (E), and (F) of defendants' previous omnibus motion filed on January 5, 1976, insofar as such materials pertain to Horace Johnson, Charles Fernald, Douglas Berry, Ira Sachs, Saul Green, and Edward Gallagher.

However, the court declines to further alter its previous ruling and will not require the Government to produce other *Brady* material or the names of other witnesses at this time. In so ruling, the court considers immaterial any possible impeachment of the content of the affidavit previously submitted to the court, but rather predicates its decision upon the apparent significance of a subsequent deletion from the Court of Appeals' original opinion in *Cannone.*

The slip opinion by Judge Smith in *Cannone* quoted with approval a footnote from the Second Circuit's previous decision in *United States v. Baum,* 482 F.2d 1325 (2d Cir. 1973), to the effect that, absent a specific need for concealment, "prevailing concepts of criminal justice oblige the prosecuting attorney to disclose to the defense the names and addresses of witnesses he intends to call at the trial." 482 F.2d at 1331, n.3, *quoted* in *Cannone, supra,* at 63. The Court then indicated that "[i]mplicit in this statement is the notion that, once the defense moves for disclosure of the identity of the government's witnesses, the government bears the burden of making a prima facie showing that such disclosure would not be in the best interests of justice." In so ruling, the Court explicitly rejected the approach of the Court of Appeals for the Ninth Circuit in *United States v. Richter,* 488 F.2d 170 (9th Cir. 1973), which had required "that the defense's motion for disclosure not even be considered unless it is accompanied by a specific showing of mate-

riality and reasonableness." *Cannone, supra,* at 64.

In their original omnibus motion, defendants, citing the above quotation from *Baum,* requested that the Government provide a witness list "[s]o that the defense is not substantially hampered in its preparation for trial, and so that continuances and potentially costly prolongation of the trial is not necessary. . . ." Defendants also noted that the *Cannone* court's rejection of the *Richter* requirement for a specific showing of need by defendants put the burden of objecting to such disclosure on the Government.

*Cannone* was argued on September 4, 1975 and decided September 26. The Government sought modification of the decision, but rehearing and rehearing *en banc* were both denied on February 17, 1976. When the opinion appeared in the Federal Reporter, however, *United States v. Cannone,* 528 F.2d 296 (2d Cir. 1975), the entire passage quoted, *supra,* had been deleted, without explanation. The question, therefore, is what significance should be attributed to this deletion, in view of the Government's attempt to seek *modification of the* decision.

 Although it still remains clear, in view of the decision in *Baum* and the remaining portions of the decision in *Cannone,* that the district court has the discretion to order production of a list of the Government's witnesses prior to trial, the effect of the excision appears to be an approval of the *Richter* requirement that defendants justify their request for production of a witness list by a specific showing of materiality and reasonableness. The burden is on the defendants to make some particularized showing of need, beyond the obvious assertion that such a list would facilitate preparation for trial.

It follows from this interpretation that defendants have not made a sufficient showing of need to justify production of a witness list. It is entirely possible that they merely felt that such a showing was unnecessary, as it indeed was under the language of the slip opinion. If this be the

case, they are free to apply again to the court for the requested order if they can make a more compelling showing of need. The request for a witness list is denied at this time. Moreover, the request for production of further *Brady* materials at this time is denied, for the reason that such production would entail disclosure of the identity of the remaining Government witnesses. Further production of *Brady* materials will be in accordance with the schedule approved in this court's order of February 12, 1976.

## VII.

Defendant Pastor has moved for an "update" of his medical condition and, based upon that updated report and the reports and testimony previously adduced concerning his physical ability to stand trial, he moves for an order directing further continuance of the trial. The Government has consented to a further medical examination of Mr. Pastor. By separate order, the court has directed the Government's physician to examine Mr. Pastor. Should this doctor conclude that Mr. Pastor is able to stand trial as scheduled on May 17, Mr. Pastor's physician will also have an opportunity to examine him and present his own observations and conclusions to the court. If Mr. Pastor's doctor concludes that he is unable to stand trial, the court will conduct a hearing prior to the commencement of trial to facilitate resolution of the conflicting evaluations.

## VIII.

Defendant Pastor finally has taken the very serious step of asking this court to recuse itself from further consideration of this case. Fully cognizant of the seriousness of the charges he is bringing, Pastor invokes the provisions of 28 U.S.C. § 144, which provide, in pertinent part:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party,

such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

As required by the remainder of the statute, Pastor's application includes an affidavit setting forth the facts upon which the allegation of bias or prejudice is based, along with a certification of counsel that the application is made in good faith.

Defendants properly point out that, to be legally sufficient to require recusal, the affidavit must show an objectionable inclination or disposition of the judge, and must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment. *Berger v. United States,* 255 U.S. 22, 33–35, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *Rosen v. Sugarman,* 357 F.2d 794, 798 (2d Cir. 1966); *Wolfson v. Palmieri,* 396 F.2d 121, 124 (2d Cir. 1968). As the United States Supreme Court has stated:

The basis of the disqualification is that 'personal bias or prejudice' exists, by reason of which the judge is unable to impartially exercise his functions in the particular case. It is a provision obviously not applicable save in those rare instances in which affiant is able to state facts which tend to show not merely adverse rulings already made, which may be right or wrong, but facts and reasons which tend to show personal bias or prejudice. It was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise . . . ." *Ex parte American Steel Barrel Co.,* 230 U.S. 35, 43–44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913); *see also Barkan v. United States,* 362 F.2d 158 (7th Cir. 1966), *cert. den.* 385 U.S. 882, 87 S.Ct. 170, 17 L.Ed.2d 109 (1966).

The Supreme Court has further made clear that

"[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell*

*Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). Should the affidavit supporting the motion fail to state a legally sufficient basis for recusal, and fail to show that bias or prejudice which the statute requires, then the judge shall *not* be disqualified, for there is a duty on the part of the judge not to recuse himself or herself when there is no proper occasion to do so. *Rosen, supra,* at 799; *Wolfson, supra,* at 124; *Hodgson v. Liquor Salesmen's Union, Local No. 2 of State of New York,* 444 F.2d 1344, 1348 (2d Cir. 1971).

Bearing in mind these judicially imposed standards for judging the sufficiency of an application for recusal, the court turns to an examination of the grounds proffered by defendant Pastor in his affidavit. Although Mr. Pastor contends that they *cumulatively* indicate "a pattern of abusive and unnecessarily harsh rulings and actions" which "mitigates [sic] against the Court's ability to continue to preside in this matter in a completely unbiased and impartial manner", they will be treated singly in the first instance.

Mr. Pastor's first contention is the very serious one that various of the court's rulings have been heedless of the precarious state of his health and have, in fact, contributed substantially to a significant worsening of his condition. Specifically, he notes that the court had been apprised from an early stage in this litigation that he suffered from a serious chronic heart condition, which both Government and defense experts were later to diagnose as severe and advanced triple-vessel coronary artery disease. An awareness of the potential severity of this condition led the court, on the defendant's motion, to order medical examinations to determine whether Mr. Pastor was physically able to withstand the rigors of a criminal trial. These examinations were conducted in New York City on February 11 and 12, 1976 by two physicians, Dr. Leslie A. Kuhn and Dr. Meyer Texon, who were selected by the defendant and the Government, respectively. Soon thereafter, the court received reports from the examining physicians, in which Dr. Kuhn concluded that Mr. Pastor's participation in a trial at that time would create a substantial "risk to his health and might have life-threatening consequences", while Dr. Texon stated that "it is very unlikely and only remotely possible that a myocardial infarction will occur" during participation in a court proceeding, and that congestive heart failure was "most unlikely now".

Because of differences of opinion between the two experts, the court ordered a hearing scheduled for February 17 to resolve the critical factual question whether Mr. Pastor was able to stand trial. On Friday, February 13, 1976, Mr. Pastor's counsel orally advised the court, in the presence of the Government's counsel, that he had been informed by Mr. Pastor's wife that the defendant's condition had become progressively worse since his return to his home in Philadelphia following the physical examination conducted by Dr. Texon on February 11, and that oxygen had to be administered to him on the night of February 12.

At that time, over objection of Mr. Pastor's counsel, the court made the order which he most severely attacks, requiring that he be present in court on the following Tuesday, February 17, at the hearing to determine his ability to stand trial. Three days later, on February 16, Mr. Pastor was hospitalized in Philadelphia with congestive heart failure, a diagnosis subsequently confirmed by the Government's physician, Dr. Texon. Consequently, Mr. Pastor was unable to be in court on the 17th, and the date of trial was adjourned to May 17, 1976.

Mr. Pastor suggests that this order that he be present at the hearing on February 17, was unreasonable and unnecessary in view of his medical history and in view of the fact that "he was to perform no role" at that hearing, "the very purpose of which was to hear medical testimony on his ability to participate in Court proceedings." However, in so arguing, Mr. Pastor neglects to indicate that the Government sought to question him at that time concerning his voluntary testimony before a federal ad-

ministrative hearing in Washington, D.C. several weeks earlier, and concerning the degree of his recent activity in managing his own pharmaceutical business in Philadelphia—both activities bearing on his ability to withstand stress and engage in some limited physical activity.

Mr. Pastor further speculates that the added tension incident to his impending appearance at this court on February 17 may well have contributed significantly to the congestive heart failure which then necessitated his hospitalization. While the court, in deciding a motion to recuse, must accept as true the facts stated by the moving party in his affidavit as the basis for his belief that prejudice exists, *Rosen, supra,* at 797, the court need not accept as true speculation of this degree, as to which reputable cardiologists might well differ. Even if it could be persuasively demonstrated that there was, in fact, a causal relationship between the court's order and Mr. Pastor's incident of congestive heart failure, such a relationship, standing alone, does not constitute cogent evidence of the existence of judicial bias or prejudice.

Nor, in the court's view, is that incident reflective of a pattern of disregard for the defendant's concededly serious heart condition which indicates bias or prejudice. The decision to subject *any* man to the rigors of a criminal trial is one of the utmost gravity. But the decision is rendered yet more difficult when the health of the accused is precarious. It is incumbent on the courts, no less than prosecutorial agencies, to avoid imposing punishment before conviction, even if that punishment is one brought about by the defendant's own physical condition. On the other hand, however, the courts have a clear duty to ensure that those persons accused of criminal activity be brought to trial as soon as possible within the limits of due process. And they must ensure that those persons able to stand trial, even with some physical discomfort, be obliged to do so.

It appears to the court that its decision to order Mr. Pastor to appear at the hearing on February 17 is merely reflective of the foregoing considerations, particularly in the face of conflicting expert testimony as to his ability to stand trial. The worst that could conceivably be said of the decision is that it was the product of an erroneous weighing of the medical evidence before the court (although the court believes this to be untrue); it was not a decision indicative of bias or prejudice against the defendant.

Defendant Pastor's second allegation of prejudice is that the court unfairly refused to adjourn the February 17 date for the commencement of trial in view of the fact that his counsel first received a copy of the most recent superseding indictment on the afternoon of February 12, when there was only one business day remaining before the first day of trial. In Mr. Pastor's view, the sudden appearance of this new indictment, with its additional count and other changes (detailed *supra*), combined with the fact that he was seriously ill, clearly necessitated an adjournment in order to ensure that he received his rights to due process and to the effective assistance of counsel.

The court is unable to find in these circumstances any legally sufficient evidence of bias or prejudice toward the defendant. The original indictment had been on file since July 31, 1975 and, according to the Government, all evidence on which the addition of the new count was based had been produced to the defense some months earlier. Moreover, the Assistant United States Attorney in charge of the case indicated that he had informed Mr. Pastor's counsel at the beginning of the preceding week that a superseding indictment would be filed and that he had informed him of the substance of the charge.

The zeal of Mr. Pastor's counsel to represent his client with meticulous care is in accordance with the highest standards of the Bar, and has been evident throughout all stages of this litigation. However, the court must also have regard for the congested nature of the dockets in this judicial district, and must often require adherence to scheduling deadlines which may appear

harsh to individual litigants, but which are necessary to ensure the expeditious handling of a large volume of civil and criminal cases. In these circumstances, the court is unable to find that its refusal to adjourn the scheduled date for the commencement of trial either potentially constituted a denial of constitutional rights or, much less, constituted evidence of extrajudicial bias or prejudice such as to warrant recusal.

 Mr. Pastor's remaining allegations may be dealt with more succinctly. He first notes that the court orally denied, on February 12, 1976, a very substantial motion to dismiss the indictment which had been made on the ground that the statute on which it was predicated was constitutionally defective in various respects. Since the court indicated at the time it rendered its decision that a written opinion would follow explaining its decision, and since the court has not yet filed that opinion, Pastor contends that this delay "suggests a cavalier disregard of the defense motions and issues genuinely made and raised." Even assuming that this court had no intention of filing a written opinion on that motion, such a circumstance would indicate no impropriety, let alone any cognizable bias or prejudice; this court is under no obligation to file a written opinion explaining its decision on any motion, although that may be the better practice in some situations.

 Mr. Pastor's next contention is that this court acted improperly in writing directly to him on March 31, 1976 and directing him to procure other trial counsel who would be able to represent him at trial on May 17, 1976—the date then scheduled for commencement of trial—if his present counsel should be unable so to do because of a serious back and leg ailment which then appeared to require hospitalization and an extended period of convalescence. Pastor's counsel, who was then in the hospital, was not consulted prior to the issuance of the letter, but he received a copy of this communication. Moreover, his associate was personally advised by the court of its actions a day later in open court, where the direction was repeated. Pastor argues that

this "invasion" of the "constitutionally sacred attorney-client relationship", especially in view of the fact that Mr. Pastor was still recovering from his congestive heart failure at the time he received the letter, reflects a continuing attitude of unfairness and presumably, prejudice toward the defendant, rather than the letter's obvious concern for preservation of his right to a speedy trial. The court is simply unable to agree that this action on its part was, in any way, violative of Mr. Pastor's rights, much less indicative of bias or prejudice against him. The letter speaks for itself.

In summary, the court cannot agree that the factual allegations contained in the affidavit of Mr. Pastor's counsel, either considered alone or cumulatively, constitute a legally sufficient showing of that personal bias or prejudice required to cause a judge to forego consideration of a case. Nor does the court find present here those "circumstances in which a judge may wish to recuse himself although a legally sufficient affidavit of bias or prejudice could not be presented against him." *Wolfson, supra*, at 125.

The motion for recusal is, accordingly, denied.

## MEMORANDUM OPINION

### ON SUBSEQUENT MOTION TO DISMISS

Defendants Edward Pastor and Martin Weiner stand indicted on one count of conspiring to violate Sections 812, 841(a)(1), 843(a)(2), and 843(a)(3) of Title 21, United States Code, and four counts of violating Section 843(a)(3) by allegedly illegally obtaining various quantities of the drugs phendimetrazine and phentermine. On this motion, they seek to dismiss the indictment pursuant to Rule 12, Fed.R.Crim.P., on constitutional grounds. However, as the court has previously ruled, the motion is denied, for the reasons more fully set forth herein.

Defendants' arguments are primarily directed at the statutory scheme embodied in 21 U.S.C. §§ 811 and 812, both on its face and as it operated to effectuate the scheduling of phendimetrazine and phentermine as

"controlled substances" within the meaning of the Drug Abuse Prevention and Control Act of 1970 (Drug Abuse Act), 21 U.S.C. § 801 *et seq.*[1] Briefly summarized, the arguments are as follows: (1) in giving to the Attorney General the authority to add new drugs to the lists of controlled substances which it initially enumerated, the Congress undertook an illegal delegation of legislative power to an officer of the Executive branch of the Government; (2) such a delegation creates an unwise and improper concentration of power in the hands of the Attorney General which is subject to abuse; (3) the standards promulgated by Congress to guide the Attorney General in the exercise of his authority are so vague as to give no guidance to the delegee; and (4) assuming, *arguendo*, the validity of the delegation effected by the statute, the Attorney General abused his discretion in scheduling phendimetrazine and phentermine by (a) improperly considering factors extrinsic to the statutory scheme and (b) failing to consider all the factors which the statute requires him to consider in making his decision. These arguments will be treated *seriatim*.

I

Defendants' first contention, of unlawful delegation, is premised upon the authority given to the Attorney General of the United States by 21 U.S.C. § 811 to add to the schedules of controlled substances, enacted by Congress and found in 21 U.S.C. § 812, certain drugs or other substances which he finds have a potential for abuse. Inasmuch as other sections of the Drug Abuse Act set forth serious criminal penalties for unauthorized dealings in controlled substances, defendants argue that this grant of scheduling authority constitutes an unconstitutional delegation of legislative power, enabling the Attorney General to render criminal conduct which had previously been innocent.

Before dealing with the specific statutory mechanism established by the Drug Abuse Act, it should be noted that the doctrine of unconstitutional delegation has been one of limited vitality and infrequent application in the federal courts in recent years. *See* Jaffe, *Judicial Control of Administrative Action* 69–72, 85 (1965); 1 K. Davis, *Administrative Law Treatise* §§ 2.01, 2.02, 2.06 (1958); Gellhorn and Byse, *Administrative Law* 60–65 (1970). Only twice has the United States Supreme Court invalidated congressional delegations to governmental authorities. *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Davis, supra,* § 2.06. Both cases "dealt with delegation of a power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom." *Fahey v. Mallonee,* 332 U.S. 245, 249, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947). Although transactions in the particular drugs here involved have apparently not been previously illegal, it is clear that drug possession and use has long been an area involving criminal sanctions.

 To say that Congress cannot delegate its power to legislate, by virtue of the separation of powers mandated by the United States Constitution is merely to declare an axiom which is of little assistance in deciding the merits of a particular statutory scheme. The Supreme Court has indicated that a delegation is ". . . constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of the delegated authority." *American Power Co. v. S.E.C.,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). What is important is that the authority given to an officer of the Executive branch be guided and circumscribed by criteria which are intelligible both to the officer involved and to a court which might be reviewing the ad-

---

1. Phendimetrazine is listed as a Schedule III drug, while phentermine is listed as a Schedule IV drug.

**1336**

ministrative decision at a later date. Thus, the propriety of a delegation is usually dependent upon the adequacy of the statutory standards promulgated to guide the administrator (as defendants argue in their third point).

However, defendants do not argue, on this branch of their motion, merely that the statutory standards are unduly vague or meaningless so as to vest an uncontrolled discretion in the hands of a government officer. Rather, they stress that the grant to the Attorney General of the authority to "create new crimes" by adding new substances to the schedules of controlled substances is invalid, irrespective of the quality of the criteria governing the exercise of his discretion. In so arguing, they explicitly disclaim, as they must, any contention that Congress cannot authorize administrative agencies (including Executive departments) to promulgate *regulations necessary or relevant to their effective functioning*, violation of which would constitute a criminal offense. *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). However, they attempt to distinguish the delegation at issue here from that involved, hypothetically, in a grant of power to the Secretary of Health, Education, and Welfare, which would, in their view, be "at least arguably necessary to the exercise of reasonable controls over pharmaceuticals." The critical distinguishing factor, they argue, is that the power to schedule drugs is here vested in the nation's chief prosecutorial officer.

This latter contention appears to be without merit, and is certainly irrelevant insofar as the question of the validity of the delegation is concerned. Since the essential evil of excessive delegation is that Congress thereby abdicates its legislative responsibility to a member of the Executive branch, the identity of that official and the nature of his duties appear irrelevant to resolution of the delegation questions.

As defendants frankly admit, their contention that this delegation is impermissible by virtue of the office of the delegee, i. e., the Attorney General, rather than his mere position in the Executive branch of the government presents this court with a question apparently of first impression. Two other courts have considered the validity of a closely similar delegation of scheduling authority to the Secretary of Health, Education, and Welfare previously found in 21 U.S.C. § 321(v)(3).[2] *White v. United States*, 395 F.2d 5 (1st Cir. 1968), *cert. den.* 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266 (1968); *Iske v. United States*, 396 F.2d 28 (10th Cir. 1968). In both cases, the courts upheld the delegation effected by the questioned statute, with a discussion which mainly considered the adequacy of the standards to guide the Secretary's decision to classify certain drugs—a discussion more appropriate to consideration of defendants' third contention, *infra*. It is certainly true that the statute involved in those cases, the Federal Food, Drug and Cosmetic Act, provided for the Secretary's *referral* of possible criminal violations of the Act to the Justice Department for prosecution, rather than for institution of criminal proceedings by the Secretary himself. However, although defendants stress this distinction, they offer no pertinent authority to support their contention that it is of vital significance. Certainly there is nothing in either *White* or *Iske* which deals with this question, because it was not before either court. In fact, defendants have cited only one case squarely holding that a delegation of the type effected by the Drug Abuse Act is impermissible. In *Howell v. Mississippi*, 300 So.2d 774 (Miss. 1974), the Supreme Court of Mississippi held unconstitutional a portion of a state statute closely modeled on the federal legislation here in question, 21 U.S.C. § 811. The Mississippi statute had permitted the State Board of Health to reschedule substances administratively, much as the Attorney General does under the federal statute, and the petitioner in

---

2. This section has since been repealed. Pub.L. 91–513, Title II, § 701(a), Oct. 27, 1970, 84 Stat. 1281.

that case was subject to a higher criminal penalty for his possession of amphetamines because the state agency had transferred that drug from state Schedule III to state Schedule II.

Faced with those circumstances, the state court squarely held (at 781) that "the authority to define crimes and fix the punishment therefor is vested exclusively in the legislature, and it may not delegate that power either expressly or by implication . . . ." In its view, the action of the state administrative agency in rescheduling the drug, and thereby increasing the criminal liability for unauthorized possession thereof, "infringe[d] on the separation of the powers of government and is prohibited."

However, as the Government properly points out, the Mississippi constitution, on which the court's decision was predicated, appears to embody a stronger anti-delegation policy than the federal Constitution. Not only does it provide, in Article I, Section 1, that the powers of the government are to be divided in tripartite fashion as in the United States Constitution, but it also goes on to provide, in Article I, Section 2, that "No person or collection of persons, being one, or belonging to one, of these departments, shall exercise any power properly belonging to either of the others. . . ." Since the Mississippi court cited both provisions in concluding that the delegation in the state statute offended the principle of separation of powers, it seems entirely possible to conclude that the conjunction of these provisions was especially persuasive in that case.

Even if this constitutional peculiarity were not involved in the *Howell* case, however, this state precedent is, of course, not binding on the federal courts. And, as several authorities have noted, the anti-delegation doctrine has retained much greater vitality in the state courts generally than it has in the federal courts. *Davis, supra,* at § 2.07; *Gellhorn and Byse, supra,* at 68; *Jaffe, supra,* at 73. Indeed, the only two federal cases cited by defendants which dealt directly with challenges to the validity of 21 U.S.C. § 811 found it unnecessary to address the arguments directed toward the delegation of authority effected by that statute. *United States v. Westlake,* 480 F.2d 1225 (5th Cir. 1973); *United States v. Jones,* 480 F.2d 954 (5th Cir. 1973), *cert. den.,* 414 U.S. 1071, 94 S.Ct. 582, 38 L.Ed.2d 476 (1973). (In each of these cases, the drug involved had been scheduled by Congress itself when the Drug Abuse Act had been originally enacted, so that the defendants had not been affected by the delegation provisions of the legislation.)

There is, thus, no pertinent federal authority squarely invalidating the delegation here at issue, and the court does not find the *Howell* case persuasive, for the reasons set forth, *supra.* Leaving aside consideration of the adequacy of the criteria to guide the delegee's action, whatever constitutional infirmity may exist in this delegation *to the Attorney General* must be found by examination in light of the due process clause, since it appears to this court irrelevant, in determining the permissibility of the delegation, whether the delegated authority is vested in one officer of the Executive branch or another. The only relevant inquiry is whether the power should be exercised outside the Legislative branch at all.

## II

The due process argument is a superficially appealing one. Defendants lay great stress upon the fact that it is the Attorney General, the nation's chief prosecutor, to whom the statute entrusts the authority to "criminalize previously innocent conduct". The specter they raise by implication is serious indeed—that of a prosecutor creating crimes by fiat and then bringing to bear the severe penalties provided by statute in pursuit of his own personal predilections. *See Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Pointing out that certain recent Attorneys General have been the subject of criminal prosecutions, they argue that this statute presents the opportunity for serious abuse of governmental authority and official discretion.

This frightening scenario is, fortunately, not a realistic possibility due to various statutory safeguards enacted in response to similar concerns which were voiced during Congressional consideration of the Drug Abuse Act. *See* H.R.Rep.No.91–1444, Sept. 10, 1970 *quoted* in 1970 U.S.Code Cong. and Admin.News, pp. 4566, 4589. The Attorney General's discretion is quite thoroughly circumscribed by procedural requirements.

While the Attorney General may, by rule, add a drug or other substance to the schedules enacted by Congress in § 812 of Title 21, he may not do so until he (a) finds that such a drug has a "potential for abuse" and (b) makes, with respect to such a drug or other substance, the findings prescribed by subsection (b) of section 812 for the schedule in which such drug is to be placed. 21 U.S.C. § 811(a). Any such rule must be made on the record after opportunity for a hearing pursuant to the rulemaking procedures prescribed by the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*

In making the finding of "potential for abuse" and in making the findings required by § 812, the Attorney General must consider eight factors outlined in § 811(c).[3] By virtue of § 811(b), however, the responsibility for investigating these factors is shared with the Secretary of HEW, in that, prior to adding or removing a substance from the schedules of § 812, the Attorney General must request from the Secretary a scientific and medical evaluation of the drug, along with his recommendations as to whether such drug should be controlled and, if so, under what schedule. In making his recommendations, the Secretary must consider all of the scientific and medical factors listed in § 811(c) and any scientific or medical considerations involved in the remaining factors.

Significantly, "[t]he recommendations of the Secretary to the Attorney General shall be binding on the Attorney General as to such scientific and medical matters, and if the Secretary recommends that a drug or other substance not be controlled, the Attorney General shall not control the drug or other substance." Section 811(b). Thus, the Attorney General may not arbitrarily schedule a drug if the Secretary finds that there is no scientific basis for doing so.[4] Moreover, his decision to schedule a drug is subject to judicial review pursuant to § 877 of Title 21.

The legislative history of the Drug Abuse Act makes clear that the hearing and judicial review provisions were added to the Act with the express purpose of checking the Attorney General's powers: "The procedure which the Attorney General must then follow to control a drug involves rulemaking proceedings on the record after opportunity for a hearing. This provides opportunity for consideration of the views of persons who would be adversely affected by control of a drug, with judicial review available thereafter . . . ." H.R.Rep.No. 91–1444, *supra*, U.S.Code Cong. and Admin. News. 1970, at 4589.

 It seems clear that the restrictions upon the Attorney General's power to "create new crimes" by adding to the lists of controlled substances are sufficient to ensure that his authority will be exercised in a

3. Sec. 811(c): "In making any finding under subsection (a) of this section or under subsection (b) of section 812 of this title, the Attorney General shall consider the following factors with respect to each drug or other substance proposed to be controlled or removed from the schedules:

 (1) Its actual or relative potential for abuse.
 (2) Scientific evidence of its pharmacological effect, if known.
 (3) The state of current scientific knowledge regarding the drug or other substance.
 (4) Its history and current pattern of abuse.
 (5) The scope, duration, and significance of abuse.

 (6) What, if any, risk there is to the public health.
 (7) Its psychic or physiological dependence liability.
 (8) Whether the substance is an immediate precursor of a substance already controlled under *this* subchapter."

4. The fact that the Attorney General may refuse to schedule a substance in the face of the Secretary's recommendation that he do so merely reduces, rather than increases, the danger of an arbitrary reclassification with attendant criminal penalties.

fashion which is both subject to public and judicial scrutiny and also grounded in scientific evidence. To suggest that this authority, which cannot be exercised without the concurrence of the Secretary, amounts to an unbridled power in the nation's chief prosecutor such as to deny the defendants their right to a fair trial and to due process of law is to engage in wholly unwarranted hyperbole. Certainly the facts of this case reveal no impropriety or abuse of power such as that suggested by defendants. As Professor Davis has noted, "[t]he principle whose soundness has been confirmed by both early and recent experience is the principle of checks. . . . We have learned that danger of tyranny or injustice lurks in unchecked power, not in blended power." *Davis, supra,* § 1.09.

### III

█ The more substantial objection which defendants raise to the delegation effected by the Drug Abuse Act is that the guidance provided by the statutorily prescribed criteria found in § 811(c) is inadequate to circumscribe the Attorney General's discretion. They more specifically argue that the standards are so vague as to render a conviction for a crime under the Act violative of due process. With this contention the court cannot agree.

The factors which both the Secretary and the Attorney General must consider in making the scheduling decision have been previously set forth.[5] Defendants direct the larger part of their criticism at the "potential for abuse" factor, arguing that it is nowhere defined in the statute and is so vague as to be totally devoid of intelligible content.[6] Since the statute mandates that both the Attorney General and the Secretary[7] consider the "actual or relative potential for abuse" of a drug proposed for scheduling, and since the Attorney General must make ultimate findings concerning the drug's potential for abuse,[8] this factor is of critical importance in the statutory scheme and was so regarded by the authors of the legislation.[9]

In this court's view, the legislative history of the Act provides ample guidance for evaluation of the potential for abuse of a drug proposed for scheduling. The House report indicates that the Attorney General should consider whether the drug is being taken in amounts sufficient to create a hazard to health or safety; whether there is significant diversion of the drug from legitimate drug channels; whether individuals are taking the drug on their own initiative without advice from a doctor; whether the drug is a new drug closely related to a drug that has already been listed as having a potential for abuse; and whether there has been misuse of the drug resulting in injuries and suicides.[10]

As noted in the House report, many of these criteria were the same as those which had previously been utilized by the Secre-

---

5. *See* note 3, *supra.*

6. They also cite the following portion of an internal HEW memorandum, authored by Dr. Henry E. Simmons and obtained by defendants as part of their pre-trial discovery, as proof that the criteria set forth in the statute are of little or no value in guiding administrative decisions: "These eight factors [found in § 811(c)] unfortunately are for the most part vague and redundant. The list exhibits circular reasoning and lack of parallelism, particularly when viewed together with the definitions of the schedules. Most importantly, the list of factors and the definitions of the schedules leave undefined the concepts of drug abuse potential, of drug dependence, and of risk to public health. In short, the factors provide little practical guidance in deciding particular cases."

Since Dr. Simmons worked for HEW, rather than the Justice Department, to which the Act had entrusted the primary responsibility for evaluating the "potential for abuse" factor, it is not surprising that he was unfamiliar with the standards applied by the latter department in evaluating that factor.

7. The Secretary must consider the scientific or medical aspects of a drug's potential for abuse. § 811(b).

8. Sections 811(a) and 812(b).

9. *See* 1970 U.S.Code Cong. and Admin.News, pp. 4601–2.

10. H.R.Rep.No.91–1444, Sept. 10, 1970, *quoted* in 1970 U.S.Code Cong. and Admin.News, pp. 4601–2.

tary of HEW to make a similar determination of "potential for abuse" under the Food, Drug and Cosmetic Act. And it was that same standard of "potential for abuse" which was sustained in *White* and *Iske, supra,* after consideration of the legislative history, against charges that it was a standard so vacant as to render void the statutory delegation of scheduling authority. As noted by the court in *White,* "[o]ther schemes much broader in scope and with less guidance to administrative agencies have been countenanced by the Supreme Court. [citations omitted]" 395 F.2d at 9.

While it seems virtually inevitable that differences of interpretation of all the statutory criteria will arise, that vice seems inherent in any system of standards which is proposed to guide an administrator's actions. The necessary inquiry must be whether the standards are so totally devoid of meaning as to form no meaningful restraint on the action of the delegee, to give him no inkling of the legislature's intent. In view of the broad standards which have previously been sanctioned by the courts,[11] this court cannot conclude that the standards of the Drug Abuse Act are impermissibly vague. As the Tenth Circuit noted in *Iske, supra,* at 31:

"In the area of drug regulation, delegations have been generally sustained despite broad standards of discretion. 1 Sutherland, *Statutory Construction* § 317 (3rd ed. 1943). This must necessarily be so, for with new drugs being discovered and introduced at an unprecedented rate, it would be impossible for Congress to determine beforehand those drugs to which it wishes a particular policy to be applied and to formulate specific rules for each situation."

## IV

■ Defendants' final contention is primarily a factual one. Based upon examination of extensive documentary material produced by the Government prior to trial, defendants contend that, even assuming the sufficiency of the standards provided by the Congress to guide the Attorney General's decision to schedule drugs, he in fact failed to consider those factors in making the decision to schedule phendimetrazine and phentermine. For the reasons set forth, *infra,* the court finds this argument unpersuasive.

As indicated previously, both the Attorney General and the Secretary of HEW bear some responsibility in the process which leads to the decision to classify a drug as a controlled substance. The Attorney General presently delegates his authority to the Administrator of the Drug Enforcement Administration, and previously, at the time of the classification of phendimetrazine and phentermine, he had delegated his authority to the Director of the Bureau of Narcotics and Dangerous Drugs (the Director). 28 CFR § 0.100. The Secretary has delegated his authority to the Assistant Secretary for Health. 21 CFR § 2.120.

The statute clearly requires that both the Secretary and the Attorney General *must* consider the factors set forth in § 811(c).[12] However, the role of the Attorney General in considering the scientific and medical factors is somewhat ambiguous, since § 811(b) provides that the Secretary's recommendations to the Attorney General as to scientific and medical matters shall be binding on him. The only reasonable interpretation reconciling these provisions must be that the Attorney General, while not obligated to investigate the scientific and medical matters *de novo,* must take into account the Secretary's findings in making his scheduling decisions, and may not predicate his decisions solely upon evidence of abuse history.

This distinction in agency functions goes far in explaining the seeming paucity of medical and scientific evidence which defendants obtained pursuant to their dis-

---

11. *See* the citations collected by the First Circuit Court of Appeals in *White, supra,* at 9.

12. *See* note 3, *supra.* Section 811(b) also speaks in mandatory terms regarding the Secretary's consideration of scientific and medical factors.

covery requests. By letter of October 17, 1975 to Richard Lebovitz, an attorney in the Office of the Chief Counsel of the Drug Enforcement Administration [13] (DEA) to whom defendants had been referred by the prosecutor in this case, defendant Pastor's counsel requested, *inter alia*, "the report of the Secretary of Health, Education and Welfare [concerning phendimetrazine and phentermine] and any accompanying documentation"; "all underlying data on which that report was based"; "any and all reports, evidence, or other materials submitted to the Attorney General"; and "all underlying data on which those reports, evidence or materials were based". After receiving some 4800 pages of material, defendants were informed, by letter from Assistant United States Attorney John Timbers dated December 22, 1975, that "the documents you received last Friday complete the D.E.A.'s response to your request for documents [previously outlined]."

After examining the material thus obtained and, properly, sorting out those documents which were obviously obtained after the date of the Attorney General's (actually the Director's) decision to schedule phendimetrazine and phentermine and which could not have been relied upon by him in this decision, defendants object (1) that there are no specific findings concerning any of the eight factors prescribed for consideration by § 811(c), and (2) more generally, that the documents—"a compilation of unsynthesized raw data"—show that not all the factors could have been relied upon in making the scheduling determinations. They argue that

"consideration of abuse-related factors is arguable, but no more. It seems clear that only when presented with the threat of hearings, in which justification of their proposals would have to be made, did B.N.D.D. begin to carry out the responsibilities Congress delegated as necessary

conditions precedent to the exercise of the delegated authority. . . . [E]xcept for documentation concerning abuse, the guiding factors upon which the Congressional delegation of authority was premised were ignored. By failing to consider all of the guidelines specified in 21 U.S.C. § 811(c), *before* scheduling phendimetrazine and phentermine, the Attorney General abused the authority Congress delegated to him. Therefore, the scheduling of those drugs is void, and conviction of a crime created by that scheduling would be a denial of due process." [14]

The short answer to defendants' first objection is that the statute does not require any findings as to the factors listed in § 811(c); the statute merely requires that the Attorney General and, where applicable the Secretary "consider" the factors there prescribed. Where the Congress intended that the Attorney General make formal findings, it so specified, as in §§ 811(a) and 812(b), and defendants do not contend that the Attorney General failed to make those findings with respect to phendimetrazine and phentermine.[15]

Disposition of defendants' second contention requires a more extended discussion of the chronology of the scheduling decisions and their background, as gleaned from the summarizing affidavit of defendant Pastor's counsel, the affidavit of William W. Vodra, who was Assistant Chief Counsel of the Bureau of Narcotics and Dangerous Drugs (BNDD) from 1972 to 1974, and the documentary evidence submitted by both defendants and the Government.

From 1971 to 1974, the BNDD Director made his decision to schedule a drug after receiving oral and written presentations from a committee appointed to evaluate any such proposals. On that committee were representatives of the Drug Control Division (SCID) of BNDD's Office of Scien-

13. The Drug Enforcement Administration is the successor agency to the Bureau of Narcotics.

14. Defendants' Memorandum in Support of Omnibus Motion, pp. 45–6.

15. The findings concerning phendimetrazine were published in 38 Federal Register 15721 (June 15, 1973) and the findings concerning phentermine were published in 38 Federal Register 18013 (July 6, 1973).

tific Support, whose function was to analyze pharmacological aspects of the drug considered for scheduling and to receive and evaluate reports of the drug's abuse that were generated by the medical community; the BNDD Office of Compliance (ENAR), which was concerned with appraisal of the diversion and illicit traffic in legitimate drugs; the BNDD Chief Counsel's Office; along with the Chief Medical Officer of BNDD.

During 1972, the Food and Drug Administration of the Department of Health, Education and Welfare (HEW–FDA) conducted a major review of all anorectic drug products, that is, products used for weight reduction in the treatment of obesity, including phendimetrazine and phentermine. According to testimony of FDA representatives in December 1972 before the Subcommittee on Monopoly of the Senate Judiciary Committee, this study was the most comprehensive review of any class of drug products ever undertaken by HEW–FDA. At that hearing, HEW–FDA announced that it would recommend placement of most of the unscheduled prescription anorectic drugs in Schedule III of § 812.

Upon learning informally of HEW–FDA's proposal to schedule these drugs, members of BNDD's SCID unit began preliminary familiarization studies of the scientific and medical aspects of the anorectics, although, as noted previously, the findings of the Secretary as to scientific and medical matters are binding on the Attorney General. In this investigation, the SCID staff members did not have access to much of the raw data regarding drug safety that FDA was using in its study because FDA considered this information to be trade secret information which was barred from disclosure by 21 U.S.C. § 331(j). Due to the incomplete nature of their information, the SCID staff members did not attempt to formulate a staff position on the scientific and medical aspects of these drugs. They considered the results of their study to be

inconclusive, and they felt that the study results were inadequate to justify a recommendation either to control or to refrain from controlling the anorectic drugs.

On February 12, 1973, HEW–FDA published in the Federal Register a notice of its findings on the effectiveness of anorectics. Subsequently, by letter dated February 15, 1973, Richard L. Seggel, HEW Acting Assistant Secretary for Health, recommended to John E. Ingersoll, the BNDD Director, that various anorectic drugs, including phendimetrazine and phentermine, be classified as Schedule III controlled substances.[16] Attached to the recommendation letter was some "review" material that HEW–FDA suggested might be of "possible utility" to BNDD and "a basis for further discussion".

After receiving this HEW–FDA recommendation, BNDD staff members assembled data concerning abuse of the drugs in question. These data tended to show that anorectic drugs were being used by illicit drug users to replace amphetamines, which had become more difficult to obtain since they had been placed in Schedule II. This apparent substitution of unscheduled anorectic drugs, including phentermine and phendimetrazine, for amphetamines and phenmetrazine corroborated HEW–FDA findings about the similarity of all these drugs in chemical structure and pharmacological profile. However, the BNDD SCID staff members who had conducted the familiarization studies of these drugs were of the opinion that the Secretary's recommendation and the attached materials were insufficient to support a scheduling proposal. Thus, at a March 13, 1973 meeting of the BNDD advisory committee, it was determined that representatives of BNDD should meet personally with representatives of HEW–FDA to determine whether HEW–FDA did, in fact, have additional data which would justify scheduling the drugs.

Subsequent to the March 13 meeting, HEW–FDA supplied to BNDD some fur-

---

16. By virtue of 21 U.S.C. § 811(f), the Secretary must notify the Attorney General if certain new drugs have a potential for abuse.

ther scientific and medical documentation concerning the scheduling proposal. Then, on March 30, Drs. Robert Zendzian and Robert Potrepka from SCID and Mr. Vodra, from the Chief Counsel's office, met with the HEW–FDA officials who participated in the HEW–FDA efficacy study of the anorectic drugs proposed for control. Based on these interviews and document analyses, the BNDD representatives concluded that the witnesses and documents did provide scientific and medical information which would be sufficient to support a determination by the Director to schedule the drugs.

On April 3, 1973, members of the anorectic drug scheduling committee and other BNDD staff members who had assisted in gathering and evaluating material for the decision on the HEW–FDA proposal met with BNDD Director Ingersoll to consider the possible scheduling of, *inter alia*, phendimetrazine and phentermine. The only documentary presentation made to the Director consisted of a memorandum of the minutes of the March 13 meeting. All other evidence was presented to the Director in oral form. These presentations included summaries of the March 30 interview with HEW–FDA officials regarding the available evidence on the pharmacological profiles

and other medical and scientific aspects of the drugs; information concerning abuse of the drugs; an assessment of the impact on BNDD resources of regulating the unscheduled anorectic drugs; and a description of the parallel between the current experience with marketed, unscheduled anorectics such as phendimetrazine and phentermine, and the early appearances of amphetamine abuse in the United States.

At the conclusion of the April 3 meeting, the Director concluded that there was sufficient evidence to justify placing phendimetrazine and phentermine on Schedule III, but that he was not willing to commit considerable BNDD resources to protracted litigation over the scheduling of these drugs. Thus, Mr. Vodra was directed to meet with manufacturers to ascertain whether they could present evidence as to why their individual drugs should not be scheduled, and whether, presumably, they would institute litigation to block the scheduling proposal.

Since only two manufacturers submitted information in response to these inquiries, the Director signed notices of proposed rulemaking for phendimetrazine, phentermine, and six other unscheduled anorectic drugs on May 1, 1973, including therein the conclusions which he had drawn from the committee's presentation,[17] and these no-

---

**17.** The Director's conclusions as to the phendimetrazine were as follows:

"(1) Phendimetrazine is chemically similar to and related to the other anorectic drugs being proposed for control, and to the amphetamine, methamphetamine, and phenmetrazine substances currently listed in Schedule II.

"(2) Phendimetrazine has a pharmacological profile which is similar to the other anorectic drugs being proposed for control and to amphetamine, methamphetamine, and phenmetrazine. This general similarity suggests that all of these drugs may be reasonably substituted for each other for therapeutic or abuse purposes.

"(3) Phendimetrazine is covered by a new drug application approved by the Food and Drug Administration for use in treatment of obesity.

"(4) Products containing benzphetamine, chlorphentermine, diethylpropion, phendimetrazine, or phentermine have been marketed in the United States for several years. In the last 6 months, certain of these products have been

reported as the subject of thefts, diversion, illicit sales, and abuse. Quantitatively, this data does not suggest a widespread problem at the present time; qualitatively, the data indicates a trend to methamphetamine in abuse circles. This reinforces the belief that abuse of the pharmacologically similar drugs will increase as the amphetamines and methamphetamine become less and less available.

"(5) The legislative history of the Controlled Substances Act makes clear that the Bureau is to schedule drugs based upon their potential for abuse, and 'should not be required to wait until a number of lives have been destroyed or substantial problems have arisen before designating a drug as subject to controls.'"

The Director further concludes that:

". . . control of all anorectic drugs is desirable at this time to insure that they will not become widely abused. This scheduling will fulfill the Congressional mandate to act before substantial problems have arisen."

The phentermine notice was virtually identical to that for phendimetrazine.

tices were published in the Federal Register.[18]

When no objections to the scheduling of phendimetrazine had been received, that drug was placed in Schedule III pursuant to an order which was signed on June 12, 1973, and which incorporated the findings required by 21 U.S.C. § 812(b)(3). 38 Federal Register 15719. Since the Pennwalt Corporation, a phentermine manufacturer, had objected to the proposed scheduling of phentermine, that drug was not included in the order of June 12. Instead, preparations were begun for a hearing, pursuant to § 811(a), on Pennwalt's objections. In the interim, however, the Director secured Pennwalt's consent to placing phentermine in Schedule IV, in order that it not be abused during conduct of the hearings.

Since the statutory criteria for placing substances in Schedules III and IV are substantially the same, with the criteria for the former being a bit more stringent, and since the legal procedures for placing drugs in the two schedules are identical, the Director considered that the May 1, 1973 notice of proposed rulemaking, which had contemplated that phentermine would be placed in Schedule III, would serve as adequate notice, within the contemplation of 21 U.S.C. § 811, for placing phentermine in Schedule IV. Neither Pennwalt nor the other phentermine manufacturers who were consulted objected to placement in Schedule IV. Accordingly, the Director placed phentermine in Schedule IV in an order dated July 6, 1973 which incorporated the requisite statutory findings. 38 Federal Register 18013. Although pre-hearing procedures were conducted in late 1973 and early 1974, no hearing has yet been held on the proposal to place phentermine in Schedule III, and

that drug is apparently still undergoing further evaluation by DEA.

To the procedure above outlined, and the data produced thereby, the defendants have raised a number of objections.

They object, first, that the Attorney General considered unwarranted and irrelevant matters in the course of determining whether to schedule phendimetrazine and phentermine. In support of this contention, they point to the memorandum of the March 13 BNDD staff meeting, which revealed that the staff discussed "the possibilities of a manufacturer of a drug requesting a hearing, the chances of BNDD winning such a hearing, and the relative costs of control in the various schedules by BNDD." In addition, the memorandum revealed that expeditious handling of the Secretary's recommendation had been urged because "the manufacturers of the five (5) presently marketed drugs are aware that BNDD has received HEW's recommendation to control their drugs and any excessive delay on our part will only serve to convince them that BNDD lacks substantial evidence for their control." Moreover, according to the Vodra affidavit, at the April 3 meeting, the Director was "presented with an assessment of the impact on BNDD resources of regulating the unscheduled anorectic drugs", which led him to direct Mr. Vodra "to meet with manufacturers to determine their response to scheduling the drugs."

The court finds this contention to be without merit. In the first place, the legislative history for one of the factors which § 811(c) directs the Attorney General to consider mandates that he consider "the economics of regulation and enforcement attendant" to a decision to schedule drugs.[19]

*In reaching his decision, the Attorney General should consider the economics of regulation and enforcement attendant to such a decision.* In addition, he should be aware of the social significance and impact of such a decision upon those people, especially the young, that would be affected by it." *1970 U.S.Code Cong. and Admin.News,* p. 4603. (Emphasis added)

---

**18.** The phentermine notice was published on May 9, 1973. The papers do not reveal when the phendimetrazine notice was published.

**19.** "(4) The scope, duration, and significance of abuse.—In evaluating existing abuse, not only must the Attorney General know the pattern of abuse, but he must know whether the abuse is widespread. He must also know whether it is a passing fad, or whether it is a significant chronic abuse problem like heroin addiction.

Thus, discussion of the probability of hearings and their anticipated costs was perfectly proper. Secondly, the Director did not attempt to ascertain the manufacturers' response to his scheduling decision until he had already determined that there was sufficient evidence on the eight factors specified in § 811(c) to warrant placing the drugs in Schedule III. Finally, the concern to avoid an appearance of indecision in the eyes of the drug industry is not such a serious extraneous consideration as to indicate any abuse of discretion on the part of the Director. If that concern had any effect on the Director's decision, it presumably affected merely the timing of his decision, rather than its substance.

They object, second, that the evidence on which the Director allegedly relied in making his finding of the drugs' potential for abuse is inadequate in both quantity and quality, since it involves only a relatively few instances of usage and small quantities of the drugs. Thus, they contend, the Director abused his discretion by failing to make an adequate "consideration" of the abuse-related factors in § 811(c).

On the basis of the legislative history of the Act, however, the court finds no such abuse of discretion. The House report essentially incorporated portions of the report which had previously accompanied the Federal Food, Drug, and Cosmetic Act. In referring to the latter report, the present report noted that "[w]ith respect to the question of the extent to which actual, as distinguished from potential, abuse was required to be established, that report stated that 'the Secretary of Health, Education, and Welfare should not be required to wait until a number of lives have been destroyed or substantial problems have already arisen before designating a drug as subject to controls of the bill.'" 1970 U.S.Code Cong. and Admin.News 4602.

Thus, the fact that only relatively small quantities of the drugs may have been diverted to illicit use is by no means necessarily indicative that they did not possess any potential for abuse of which the Director should take official cognizance. It is pre-cisely for the purpose of avoiding large scale misuse of legitimate drugs that the BNDD (and now the DEA) is staffed with people who are presumably competent to assess the significance of shifting patterns of drug usage. Thus, in addition to the quantities involved, it is significant that the evidence considered by BNDD included investigations by Texas law enforcement officials involving criminal trafficking in these drugs by physicians, reports of phentermine thefts from several wholesalers and retailers in circumstances which indicated that the purpose of the theft was criminal distribution or abuse of the drug, and non-medical use of phentermine by truck drivers. Moreover drug treatment programs also reported that phentermine had a "street name", giving some indication that it was becoming familiar among non-medical users.

On this record, the court cannot find that the Director abused his discretion in recommending that phendimetrazine and phentermine be scheduled. The instances above cited, when viewed together with the drugs' chemical similarity to amphetamines and phenmetrazine, which had already been scheduled, clearly amount to substantial evidence from which the Director could find that these drugs possessed a potential for abuse. And the Director is not obliged to wait until misuse of these drugs has reached epidemic proportions before he takes steps to control their dispersion.

Although defendants conceded, *supra,* that the materials in their possession at least arguably revealed that the Director had considered the abuse-related factors of § 811(c), they vigorously assert that these materials are so deficient in data of a scientific or medical nature concerning phendimetrazine and phentermine that the Director clearly failed to consider *all* the factors mandated by § 811(c), and therefore abused his discretion in recommending that those drugs be scheduled as controlled substances. While this argument raises somewhat different problems than the previous contention, the court cannot find that de-

fendants have met their burden of showing that the Director abused his discretion.

In the first place, although defendants initially requested virtually all the tangible data and reports on which the Secretary and the Attorney General relied in making their respective recommendation and decision to schedule these drugs, they apparently received only that material which is presently in the possession of the DEA. It is not clear to the court whether defendants were specifically advised, before they made their motion, that this documentary response did not include a considerable body of scientific material which allegedly is in the possession of HEW–FDA, and which officials of that agency had not previously turned over to BNDD. However, the result of this discrepancy between request and response is that the documents which the defendants examined, and on which their motion is predicated, do not apparently contain all the medical and scientific data which the Secretary accumulated in his evaluation of these drugs.

Thus, much of defendants' carefully documented analysis of these materials loses its cogency. In the first place, as the court interprets the statute, the Attorney General need not undertake his own, independent investigation of the scientific and medical criteria and develop his own data in that regard when, as in this case, the Secretary initiates the scheduling proposal based upon his own research.[20] The Attorney General is entitled to rely upon—and is, in fact, bound by—the Secretary's recommendations as to scientific and medical matters. Thus the adequacy of scientific and medical data independently procured by BNDD is not determinative of the question whether the Director adequately considered the factors set forth in § 811(c).

Secondly, it appears that, in fact, the bulk of the data on which the Secretary allegedly predicated his recommendation was never turned over to the defendants in documentary form. Only a small quantity of "review" material was attached to the Secretary's letter of recommendation in February of 1973, and this material was considered by BNDD personnel to be "[in]sufficient standing alone to support a scheduling proposal." Further materials subsequently supplied to BNDD by HEW–FDA in March of 1973, and provided to defendants by DEA, include only six pages of experimental data relating to phendimetrazine and phentermine, and twelve bibliographical citations.

According to the affidavit executed by Mr. Vodra and submitted by the Government, the critical exchange of information from HEW–FDA to BNDD officials occurred orally at the meeting on March 30, 1973. It was at this meeting that the BNDD representatives were apprised of the full extent of the testimony and documents which HEW–FDA had developed in its study of the anorectic drugs. And it was this data summary which satisfied the BNDD advisory committee that it could recommend to the Director that he schedule those drugs, including phendimetrazine and phentermine, which HEW had previously recommended for control. It was then at the April 3 meeting that the Director received the primarily oral staff presentation of research findings concerning both scientific and medical factors and also abuse-related factors. Based upon that presentation, the Director made his decision to schedule these drugs.

The Government's response to defendants' painstaking documentary analysis leaves two questions, one concerning the sufficiency of the Government's evidentiary showing and one concerning the procedures adopted by the Director in making his decision.

The Government does not attempt to parry the defendants' item-by-item analysis of

---

**20.** The court has noted that § 811(b), in requiring the Attorney General to request an evaluation of scientific and medical matters from the Secretary, does provide that he do so "after gathering the necessary data". However, the court construes that latter phrase to be inapplicable to cases, such as this, where the Secretary himself requests that substances be scheduled based upon research which he has already completed.

the DEA documents with its own demonstration of the purportedly extensive medical and scientific data which the HEW–FDA study developed. Rather, Mr. Vodra's affidavit merely describes it in conclusory and general terms, presumably because such a demonstration of material in HEW's possession would be irrelevant to the question whether the Director abused his discretion, if he never saw the material anyway and only relied on oral summaries of its contents. Instead, Mr. Vodra simply asserts that, at the April 3 meeting, the substance of these data was conveyed to the Director, who then considered the factors which he must consider under the statute, having particular regard to the general categories of information previously mentioned by the court in the discussion of that meeting.

The narrow question, then, is whether Mr. Vodra's sworn representation that the Secretary considered the factors required by § 811(c) at the April 3 meeting, taken together with the other material produced by the Government, constitutes a sufficient showing that the Director did not abuse his discretion in deciding to schedule these drugs. The court holds that it does, and that defendants have not sustained their burden of showing that he abused his discretion by failing to consider either the abuse-related or medical or scientific factors listed in § 811(c). Although Mr. Vodra's affidavit speaks of the April 3 meeting in rather general terms, he would presumably amplify those statements at a hearing, if the court were to order one; but the court finds his sworn statement sufficient to negate the inference of abuse of discretion.

The question of the sufficiency of the Government's affidavit is closely interrelated with defendants' challenge to the sufficiency of the procedures adopted by the Director to inform himself concerning the factors in § 811(c).

Defendants contend first, that the meeting of March 30, of which, apparently, no transcript, memoranda, nor notes survive, was inadequate to review the medical and scientific findings of HEW–FDA. Without going so far as to explicitly suggest that the meeting was a mere fabrication of Mr. Vodra, they argue that that meeting afforded no way to determine whether HEW–FDA, in turn, had considered all the factors which the statute requires the Secretary to consider. And, they conclude, it is strange that, after amassing almost 5000 pages of documents concerning the scheduling of these drugs, the final staff determination on five of the eight factors of § 811(c) should be left to the unrecorded determination of three individuals.

Secondly, defendants contend that the manner in which the Director reviewed the evidence amassed by his staff and that of HEW–FDA was inadequate, in that he received presentations which were almost completely oral at a meeting of which neither transcript nor memorandum survive.[21] The decision to schedule a substance for control, they urge, should be made in a more formal manner. "When Congress delegated to the Attorney General the authority and power it did, it certainly did not mean to delegate an unbridled discretion to act. Such would be the result, however, if decisions which result in major criminal sanctions are allowed to be based upon unreviewable, oral presentations, not even effectively memorialized."[22]

The basis on which defendants make these final contentions is not entirely clear, and the argument is not supported by authorities. The contention appears to be that these informal, oral procedures are inadequate to ensure that the Director reviews the factors which he must consider, and, therefore, that he abused his discretion in relying on them in this case. (Correlatively, the argument must be that conviction for illicit involvement with a drug

---

**21.** Neither a transcript nor a memorandum of the minutes of the meeting was ever prepared. The only extant memorandum is that presented to the Director *before* the meeting.

**22.** Defendants' Reply Affidavit in Support of Motion, pp. 6–7.

scheduled in accordance with these procedures would violate the defendants' due process rights.) Defendants do not appear to contend that Mr. Vodra's affidavit is fabricating accounts of either of the meetings or their contents.

This suggestion of procedural inadequacy finds no support in the Drug Abuse Act itself. Clearly the Congress did not see fit to explicitly require that the Attorney General or his delegee consider the factors of § 811(c) either at a hearing or in a written report. However, its failure to do so is to be contrasted with its explicit requirement, if the Attorney General initiates proceedings under § 811(b),[23] that "[t]he evaluation and the recommendations of the Secretary shall be made in writing and submitted to the Attorney General within a reasonable time."[24] The fact that the Congress was concerned generally with procedural propriety is manifested by its requirement that the Attorney General comply with the procedures of the Administrative Procedure Act in promulgating rules under § 811. Yet nothing in the rulemaking provisions of that legislation would require that the Director "consider" these factors at a memorialized meeting. It is sufficient for purposes of the APA that interested persons have notice of the Attorney General's proposed decision and the opportunity to express their views as to his action. There is no suggestion that such notice and opportunity for hearing were not properly afforded by the Attorney General in this case.

The narrow question then remaining is whether, under the rubric of preventing an abuse of discretion, the court will impose further procedural requirements on the Attorney General, beyond those which the Congress has seen fit to establish in either the Administrative Procedure Act or the Drug Abuse Act itself. This the court declines to do.

Defendants' suggestion that the Director's utilization of the informal, oral procedures previously described creates an "unbridled discretion to act" because the presentations are "unreviewable" is, in the court's view, hyperbolic. His findings and recommendations to schedule drugs as controlled substances are subject to public scrutiny through the notice and hearing provisions of the Administrative Procedure Act, and are subject to judicial review pursuant to 21 U.S.C. § 877. Although Congress has not required that he make written findings as to the factors he must consider in § 811(c), any allegation that he failed to make the requisite consideration can be tested—and his discretion reviewed—in precisely the manner in which it is being tested in this case, by procuring the sworn testimony of those individuals who participated in the process, and, if necessary, obtaining further documentation. Any conceivable suggestion that such a course of inquiry would, or could, be frustrated by a systematic pattern of perjury would be irresponsible and clearly finds no support in this record. Absent any more convincing demonstration of the inaccuracy or inadequacy of this mode of review, the court is unwilling to impose further procedures and paperwork on an internal agency function.

The motion to dismiss the indictment is, accordingly, denied.

---

**23.** As he did not in this case. The Secretary initiated the Attorney General's action pursuant to § 811(f).

**24.** Defendants do not suggest that this phrase in the statute invalidates the procedure which the Director utilized at the March 30 meeting.